UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____
                                 )
WESTERN RESERVE LIFE ASSURANCE   )
CO. OF OHIO,                     )
                    Plaintiff,   )
                                 )
        v.                       )   C.A. No. 09-470 S
                                 )
CONREAL LLC, HARRISON CONDIT,    )
FORTUNE FINANCIAL SERVICES, INC.,)
and ANTHONY PITOCCO,             )
                    Defendants;  )
_____)
                                 )
TRANSAMERICA LIFE INSURANCE      )
COMPANY,                         )
                    Plaintiff,   )
                                 )
        v.                       )   C.A. No. 09-471 S
                                 )
JOSEPH CARAMADRE, RAYMOUR        )
RADHAKRISHNAN, ESTATE PLANNING   )
RESOURCES, INC., ESTELLA RODRIGUES,)
EDWARD MAGGIACOMO, JR., LIFEMARK )
SECURITIES CORP., and            )
PATRICK GARVEY,)                 )
                    Defendants;  )
_____)
                                 )
WESTERN RESERVE LIFE ASSURANCE   )
CO. OF OHIO,                     )
                    Plaintiff,   )
                                 )
        v.                       )   C.A. No. 09-472 S
                                 )
JOSEPH CARAMADRE, RAYMOUR        )
RADHAKRISHNAN, ESTATE PLANNING   )
RESOURCES, INC., ADM ASSOCIATES, )
LLC, EDWARD HANRAHAN, THE LEADERS)
GROUP, INC., and CHARLES BUCKMAN,)
                    Defendants;  )
_____)

```
WESTERN RESERVE LIFE ASSURANCE    )
CO. OF OHIO,                      )
                   Plaintiff,    )
                                 )
      v.                         )    C.A. No. 09-473 S
                                 )
JOSEPH CARAMADRE, RAYMOUR        )
RADHAKRISHNAN, ESTATE PLANNING   )
RESOURCES, INC., DK LLC, EDWARD  )
HANRAHAN, THE LEADERS GROUP, INC., )
and JASON VEVEIROS,              )
                   Defendants;   )
_____)
                                 )
WESTERN RESERVE LIFE ASSURANCE   )
CO. OF OHIO,                     )
                   Plaintiff,    )
                                 )
      v.                         )    C.A. No. 09-502 S
                                 )
JOSEPH CARAMADRE, RAYMOUR        )
RADHAKRISHNAN, ESTATE PLANNING   )
RESOURCES, INC., EDWARD HANRAHAN, )
and THE LEADERS GROUP, INC.,     )
                   Defendants;   )
_____)
                                 )
TRANSAMERICA LIFE INSURANCE      )
COMPANY,                         )
                   Plaintiff,    )
                                 )
      v.                         )    C.A. No. 09-549 S
                                 )
LIFEMARK SECURITIES CORP.,       )
JOSEPH CARAMADRE, RAYMOUR        )
RADHAKRISHNAN, ESTATE PLANNING   )
RESOURCES, INC., and EDWARD      )
MAGGIACOMO, JR.,                 )
                   Defendants;   )
                                 )
_____)
```

```
WESTERN RESERVE LIFE ASSURANCE     )
CO. OF OHIO,                        )
                    Plaintiff,     )
                                   )
     v.                            )     C.A. No. 09-564 S
                                   )
JOSEPH CARAMADRE, RAYMOUR          )
RADHAKRISHNAN, ESTATE PLANNING     )
RESOURCES, INC., HARRISON CONDIT,  )
and FORTUNE FINANCIAL              )
SERVICES, INC.,                    )
                    Defendants.    )
_____)
```

## OPINION AND ORDER

WILLIAM E. SMITH, United States District Judge.

In these cases, Plaintiffs Transamerica Life Insurance Company ("Transamerica") and Western Reserve Life Assurance Company of Ohio ("Western Reserve") claim they have been defrauded in an annuity scam. Plaintiffs allege that Defendants found a way to use variable annuities as a vehicle for riskless speculation in securities. The key to the scheme was recruiting terminally-ill people as annuitants — the individuals whose lives were used as measuring tools for the contracts. Defendants or their clients would buy policies that allowed them to invest the premiums in stocks and bonds. When the annuitants died, the policies' so-called "death benefits" guaranteed the return of those invested premiums, effectively creating a buffer against losses. The Complaints seek to revoke the outstanding

annuities on grounds of fraud, and assert a variety of state law claims for damages.  Defendants now move to dismiss all of them.

At bottom, beneath the public outcry about the exploitation of the dying, these disputes pivot on a series of state law questions.  The answers to these questions unravel many, but not all, of Plaintiffs' claims.  Accordingly, for the reasons set forth below, Defendants' motions are granted in part and denied in part.

I.   Background

A.   Overview of the "STAT" scheme and parties

The genesis of these cases is a scheme for annuity investments that Plaintiffs dub "stranger-initiated annuity transactions," or STATs.  Because the Court must accept the alleged facts as true for purposes of Defendants' motions pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, it here provides an overview of the STATs drawn from the Complaints.

Defendant Joseph Caramadre is an attorney who specializes in reading the fine print of insurance and annuity products and finding "loopholes."  The one he discovered in these actions focused on two components of certain annuities sold by Plaintiffs.  One, the annuities were variable, which means that premiums paid to obtain the policy could be invested in

securities on behalf of the owner. Two, the annuities allowed the owner to elect a "death benefit." This option guaranteed the return of premiums upon the death of the annuitant, no matter what the market value of the policy was at that time. (See, e.g., Am. Compl., C.A. No. 09-471, Doc. No. 9, Oct. 16, 2009 (hereinafter "471 Compl.") ¶¶ 14-17; Am. Compl., C.A. No. 09-472, Doc. No. 8, Oct. 16, 2009 (hereinafter "472 Compl.") ¶¶ 14-17; Am. Compl., C.A. No. 09-473, Doc. No. 8, Oct. 16, 2009 (hereinafter "473 Compl.") ¶¶ 14-17; Compl., C.A. No. 09-502, Doc. No. 1, Oct. 16, 2009 (hereinafter "502 Compl.") ¶¶ 13-16; Compl., C.A. No. 09-549, Doc. No. 1, Nov. 16, 2009 (hereinafter "549 Compl.") ¶¶ 12-15; Compl., C.A. No. 09-564, Doc. No. 1, Nov. 24, 2009 (hereinafter "564 Compl.") ¶¶ 12-15.)

Caramadre's insight was that policies with those two features invited riskless securities speculation. The annuitants would of course die at some point. If one could safely bet that would happen quickly, the annuities could be used to turn fast profits. Investors could make aggressive short-term trades without worrying about losses. Thus, the key to the strategy was finding terminally ill individuals, with a correspondingly short life expectancy, willing to be annuitants.

To find such individuals, Caramadre and his associates, including Defendant Raymour Radhakrishnan, began publicizing a

"Program for the Terminally Ill" to hospice patients and workers. (See 564 Comp. Ex. A.) Flyers bearing the business name "Estate Planning Resources," a company allegedly controlled by Caramadre, promised cash payments to dying patients willing to do business with the company. (See id.) Once either Caramadre or Radhakrishnan identified both a terminally-ill annuitant candidate and an investor, they arranged for a licensed agent of an annuities broker to provide the annuity application. They then paid the sick patient to sign the application as the annuitant. In some instances, Plaintiffs claim, Caramadre, Radhakrishnan, or the agent actually forged the annuitant's signature. The investor would be designated as the owner and beneficiary on the application, and would pony up the cost of the policy.

Once completed, the insurer accepted the application and issued an annuity in which the owner had no relationship to the annuitant, other than through the alleged STAT itself. (See, e.g., 472 Compl. ¶¶ 15-18; 473 Compl. ¶¶ 16-19; 502 Compl. ¶¶ 15-18; 549 Compl. ¶¶ 14-17.) Within this broad framework, all Defendants fit into one of the following categories:

- "Sponsors" of the STAT scheme, a term the Court uses to refer to Caramadre and Radhakrishnan, who solicited the transactions, as well as their alleged company Estate

Planning Resources ("EPR").  They are named Defendants in each of the actions except 09-470.[1]

- <u>Annuity brokerage companies</u>, who sell Plaintiffs' annuities.  The broker in case numbers 09-470 and 09-564 is Fortune Financial Services, Inc. ("Fortune"); in 09-471 and 09-549, it is Lifemark Securities Corporation ("Lifemark"); and in 09-472, 09-473, and 09-502, it is The Leaders Group ("Leaders").

- <u>Agents</u> of the brokers: the individuals who are licensed to sell annuities and provided the policies at issue at the request of Caramadre and/or Radhakrishnan.  Fortune's agent, named as a Defendant in cases 09-470 and 09-564, is Harrison Condit; Lifemark's agent, named in 09-471 and 09-549, is Edward Maggiacomo; Leaders's agent, named in 09-472, 09-473, and 09-502, is Edward Hanrahan.

- <u>Owners</u> of annuities in the four actions in which the annuitant is still living, cases 09-470 through 09-473.  These are the people or corporations who paid premiums for the policies, and stand to redeem the proceeds because they are also designated as the beneficiaries.  In case number 09-470, the owner is Conreal LLC ("Conreal"); in 09-471, it is Estella Rodrigues; in 09-472, it is ADM Associates, LLC ("ADM"); and in 09-473, it is DK LLC ("DK").  In the other three cases, the annuitants are deceased, and the owners are not named as Defendants.

- <u>Annuitants</u>: the terminally ill individuals who serve as measuring lives for the annuities in cases 09-470 through 09-473.  In 09-470, the annuitant is Anthony Pitocco; in 09-471, it is Patrick Garvey; in 09-472, it is Charles Buckman; and in 09-473, it is Jason Veveiros.

---

[1] In that case, Western Reserve claims that the agent of the annuities broker, Harrison Condit of Fortune Financial Services, Inc., put together the deal himself, without Caramadre or Radhakrishnan.

B.   Claims and defenses

The Complaints assert the following claims for relief: (1) rescission of the policies in which the annuitants are still living, or a declaratory judgment that the annuities are void, because they were procured on the basis of fraud, and because the owners lack an "insurable interest" in the annuitants as required by R.I. Gen. Laws 1956 § 27-4-27 (2010); (2) common law fraud against the sponsors, brokers, agents, and some of the owners, because Defendants submitted the annuity applications without telling Plaintiffs that the investments were STATs; (3) civil liability pursuant to R.I. Gen. Laws § 9-1-2 for criminal insurance fraud under R.I. Gen. Laws § 11-41-29, against the sponsors, brokers, agents, and some of the owners; (4) civil conspiracy against the sponsors, brokers, agents, and some of the owners; (5) breach of contract against the brokers, for violating the brokerage service agreements between Plaintiffs and the brokers; (6) breach of the implied covenant of good faith and fair dealing against the brokers; (7) unjust enrichment against the brokers and agents, for taking commissions from Plaintiffs in connection with the annuities; and (8) negligence against the brokers and agents, for allowing the submission of annuity applications pursuant to the STAT.

Defendants move to dismiss the Complaints pursuant to Rule 12(b)(6) for failure to state claims on which relief may be granted.  In total, Defendants assert dozens of grounds for dismissal.  However, stripped to the essentials, most of their arguments rest on three propositions: (i) the "insurable interest" requirement does not apply to the annuities; (ii) an "incontestability clause" contained in each of the policies prevents Plaintiffs from litigating any claims related to the annuity applications; and (iii) Defendants did not make any material misrepresentations or omissions in connection with the annuity applications.

II. Discussion

A.   The Legal Standard

In reviewing a motion to dismiss, the Court must "accept the well-pleaded facts as true, viewing factual allegations in the light most favorable to the plaintiff." Rederford v. US Airways, Inc., 589 F.3d 30, 35 (1st Cir. 2009).  To meet the general pleading requirements of Rule 8 of the Federal Rules of Civil Procedure, each Complaint "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This means it must present "factual allegations that raise a

right to relief above the speculative level." Simmons v. Galvin, 575 F.3d 24, 30 (1st Cir. 2009) (citation and internal quotation marks omitted). In judging whether this standard is satisfied, the Court may consider not only the Complaints, but "facts extractable from documentation annexed to or incorporated by reference in the [C]omplaint[s] and matters susceptible to judicial notice." Jorge v. Rumsfeld, 404 F.3d 556, 559 (1st Cir. 2005).

In addition, Plaintiffs' fraud claims must meet the heightened pleading requirements of Rule 9(b), which "applies to state law fraud claims asserted in federal court." N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009). These claims must "specify the who, what, where, and when of the allegedly false or fraudulent representation." Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 29 (1st Cir. 2004). Rule 9(b) also requires "identifying the basis for inferring scienter," which refers to the culpable mental state of knowingly or intentionally committing fraud. N. Am. Catholic Educ., 567 F.3d at 13; accord Suna v. Bailey Corp., 107 F.3d 64, 68 (1st Cir. 1997).

B.   Claims for rescission and declaratory judgment that the annuities are void <u>ab</u> <u>initio</u>

Plaintiffs contend the annuities are void or voidable on two grounds: one, the owners have no insurable interest in the annuitants, in violation of state law; and two, Plaintiffs were defrauded.   Because both arguments fail, the rescission and declaratory judgment claims must be dismissed.

1.   <u>The insurable interest requirement</u>

Section 27-4-27 of Rhode Island's General Laws provides:

> No person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under the contract are payable to the individual insured or his or her personal representatives, or to a person having, at the time when the contract was made, an insurable interest in the individual insured.

R.I. Gen. Laws § 27-4-27(a) (2010).[2]   An "insurable interest" generally means that the owner of an insurance policy must have either "a substantial interest engendered by love and affection" in the insured, <u>id.</u> § 27-4-27(c)(1), or a "lawful and substantial economic interest in having the life, health, or bodily safety of the individual . . . continue," <u>id.</u> § 27-4-

---

[2] There is no dispute that Rhode Island law governs most of Plaintiffs' claims, including their requests for equitable relief and their tort claims.   However, the contract-based claims (breach of contract and breach of the duty of good faith and fair dealing) are an exception.   As noted below, the brokerage contracts between Plaintiffs and the brokers expressly designate either New York or Florida law as controlling.

27(c)(2).   From a public policy point of view, the insurable interest rule guards against creating incentives to shorten human life.   As the Rhode Island Supreme Court said over 100 years ago, "a purely speculative contract on the life of another is . . . objectionable on the grounds of public policy."   See Cronin v. Vt. Life Ins. Co., 40 A. 497, 497 (R.I. 1898).

Defendants correctly contend that the insurable interest requirement does not apply to the contracts at issue in these cases, because they are not "insurance contract[s] upon the life or body of another."   R.I. Gen. Laws § 27-4-27(a).   The subject contracts are annuities, and nothing in the statute supports Plaintiffs' plea to ignore this fact and treat them as insurance policies.

Plaintiffs' argument that § 27-4-27(a) should be read to embrace annuities first hits a statutorily-created wall between insurance and annuities in Rhode Island.   The General Laws place the two instruments in separate categories:

> (a) "Annuities" means all agreements to make periodic payments for a certain period or where the making or continuance of all or some of a series of the payments, or the amount of any payment, depends on the continuance of human life, except payments made in connection with a life insurance policy.
>
>         . . . .
>
> (c) "Life insurance" means every insurance upon the lives of human beings and every insurance appertaining

12

to that life, including the granting of endowment benefits, additional benefits in the event of death by accident, additional benefits to safeguard the contract from lapse, accelerated payments of part or all of the death benefit . . . .

R.I. Gen. Laws § 27-4-0.1 (emphasis added).[3]

The General Assembly recently reinforced the statutory distinction between annuities and life insurance by enacting the Life Settlements Act ("LSA"), which takes effect in July, 2010. The LSA prohibits "stranger originated life insurance" or "STOLI" transactions.   See R.I. Gen. Laws § 27-72-2(9)(i)(A)(X) (defining STOLIs as "fraudulent life settlement act[s]"); id. § 27-72-14 (prohibiting "fraudulent life settlement acts").   A STOLI is "a practice or plan to initiate a life insurance policy for the benefit of a third-party investor who, at the time of policy origination, has no insurable interest in the insured." Id. § 27-72-2(26) (emphasis added).   Put differently, it is exactly what Plaintiffs complain of in these cases, except with life insurance policies instead of annuities.   But the word "annuity," which appears dozens of times in Title 27 of the

---

[3] In isolation, the reference to a "death benefit" in subsection (c) could set the reader wondering whether annuities with death benefit features could be "life insurance."   But subsection (a) appears to preclude that possibility.   It says, paraphrased, that annuities are not life insurance.   As discussed below, the Court does not need to decide if a product could be an annuity and life insurance simultaneously.   The Court simply finds that the contracts in this case are not life insurance contracts.

General Laws, is not used once in the LSA. Had the General
Assembly intended to extend the ban on stranger-owned products
to annuities, it could easily have said so in the new law. All
of this helps to smother Plaintiffs' contention that the words
"any insurance contract" in § 27-4-27(a) should refer to
annuities. See id. § 27-4-27(a).

Plaintiffs contend in the alternative that annuities may
operate as "'hybrid products,' possessing characteristics of
both insurance products and investment securities." Lander v.
Hartford Life & Annuity Ins. Co., 251 F.3d 101, 105 (2d Cir.
2001). In this respect, Plaintiffs argue that Rhode Island
courts have labored to look beneath the surface to expose life
insurance cloaked under different names. For example, in Sisson
ex rel Nardolillo v. Prata Undertaking Co., 141 A. 76 (R.I.
1928), the court determined that burial contracts offered by an
undertaker constituted "insurance." The contracts were multi-
year agreements providing for pre-paid funeral services. If
death occurred before a series of annual payments was completed,
the undertaker agreed that he would not levy any additional
charge against the decedent's heirs, and would provide the
services.[4] See id. at 76. The death benefits in the policies at

---

[4] Thus, the bargain replicated the tradeoff in a basic life
insurance policy: if the owner died early, he won (in a

14

issue here, Plaintiffs insist, must be treated the same way as the contracts in Sisson; they are also, in substance, "insurance contract[s]." R.I. Gen. Laws. § 27-4-27(a).

The proposed analogy to Sisson squirms out of Plaintiffs' grip. The contract in that case was a straightforward agreement to provide a service, with a provision that if death interceded, the product purchased would still be provided and further costs waived. Similar contracts are commonplace in modern times for mortgage insurance, life insurance, or auto loans. Here, however, the products at issue are not modern-day analogues to the funeral services contract. The annuities in question are specific, well-understood financial instruments, and while they also happen to involve monetary exchange connected to the duration of a life, they are not life insurance. Again, as noted, the distinction between annuities and life insurance is significant enough to warrant separate definitions for the two vehicles in Rhode Island statutes.

So, even if the Court agreed that hybrid annuity / life insurance policies could breach the statutory language barrier, something more than the narrow holding in Sisson would be required to find in Plaintiffs' favor. Foreshadowing the

financial sense), because he got the entire benefit without having to pay the full cost of the contract. As explained below, that is not the case with the annuities at issue here.

statutory demarcation, older decisions from the Rhode Island Supreme Court recognized that there is a fundamental difference between life insurance, which requires an insurable interest in order to prevent gambling on human life because it is against public policy, and annuities, which embrace the gamble as a core component of the contract:

> It is true there is an element of chance and uncertainty in the transaction; but so there is when a man takes a transfer of an annuity, or buys a life estate, or an estate in remainder after a life estate. There is in all these cases a speculation upon the chances of human life. But the transaction has never been held to be void on that account.

Clark v. Allen, 11 R.I. 439, 1877 WL 4932, at *4 (R.I. 1877); see Cronin, 40 A. at 497 (stating the same conclusion).[5]  Simply because the court in Sisson saw the contract as more closely resembling a life insurance contract does not vitiate the clear statements in Clark and Cronin about the nature of annuities.

---

[5] Surely, Plaintiffs protest, annuities in the nineteenth century were far simpler than the exotic instruments here.  But that is not a reason to assume the Rhode Island Supreme Court, if presented with the question, would find that the insurable interest rule governs the policies at issue.  The court could instead choose to maintain the distinction between life insurance and annuities, even while acknowledging the more sophisticated investment aspects of modern annuities.  See Nationsbank of N.C., N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 255, 260 (1995) (finding that variable annuities, "though more sophisticated than the standard savings bank deposits of old," are "not insurance" under federal statutes).

The products at issue here, without question, fit within that core concept.

To be more precise, even if hybrid policies are theoretically possible under Rhode Island law, the present contracts cannot meet any reasonable definition of what such a policy would have to look like. In the Court's view, in order for an annuity to qualify as a hybrid policy, at a minimum it would need to have life insurance at its core, as the contracts in Sisson did. That is not the case here. The basic bargain embodied by the policies in dispute is that, in exchange for premiums, the owners receive a future income stream. (See, e.g., Mot. to Dismiss by Conreal LLC and Harrison Condit, Ex. A-2. at 16, C.A. No. 09-470, Doc. No. 22 (Nov. 13, 2009) (explaining payment options).) The death benefits merely sweeten that deal; they do not define it. They take away the worry that future payments will dwindle if the market sours. As a Western Reserve brochure states: "Regardless of market performance or how [your funds] are allocated, your legacy is protected [by the death benefit]." (502 Compl. Ex. B at 8.) Of course, the whole point of the STATs was to capitalize on the death benefits. But that is because Defendants figured out how to game a flaw in the product, not because the products are life insurance vehicles. The terms of the policies, and Plaintiffs'

own marketing materials, present the death benefit not as the core benefit of the product, but rather as an ancillary perk.[6]

Plaintiffs' arguments might be more persuasive if they had treated the contracts as life insurance by taking steps to guard against the "temptation to shorten life." Cronin, 40 A. at 497. At oral argument, Plaintiffs agreed that "the law makes it [their] obligation to ensure [that] the insurable interest" requirement is met. (Hr'g Tr. 58:24–59:4, Mar. 15, 2010.) Yet, the annuity applications do not pose any questions about the relationship between the annuitant and either the owner or the beneficiary. (See, e.g., 471 Compl. Ex. D. at 1–2; 502 Compl. Ex. C at 1–2.) Thus, as Plaintiffs acknowledge, the argument that the death benefits are life insurance could land them in a precarious position outside these lawsuits. But more importantly, their application procedures suggest that this argument is a newly-minted reaction to Defendants' scheme, as opposed to a long-held belief about the nature of the contracts.

---

[6] In contrast, in Sisson, the life insurance feature was built into the central purpose of the policy. Specifically, the value of the contract in that case was a function of when measuring life ended. Here, no matter when the annuitant dies, the death benefit guarantees the return of premiums, but not more than what the owner paid for the policy. Any gains derive from market increases — not, as in Sisson, from the owner's death before he can complete the payments.

In short, there is no basis in this case to stretch the Rhode Island insurable interest rule to include the contracts at issue here.  Doing so would not only torture the language of § 27-4-27(a), ignore the statutory division between annuities and life insurance, and break new ground that the Rhode Island Supreme Court has not touched; it also would trample any possible construction of the hybrid concept that is consistent with Rhode Island law.  Sitting in diversity jurisdiction, this Court could not take that step, even if it wanted to (which it does not).  See Luc v. Wyndham Mgmt. Corp., 496 F.3d 85, 88 (1st Cir. 2007) (explaining that courts sitting in diversity should "not create new rules" of state law "or significantly expand existing rules").  Accordingly, the Court finds the insurable interest requirement creates no grounds to nullify the annuities.

### 2.   The incontestability clauses

Defendants rely on clauses contained in the annuities that state, "This policy shall be incontestable from the Policy Date." (See, e.g., Mot. to Dismiss of Conreal LLC and Harrison Condit, Ex. A2 at 4, C.A. No. 09-470, Doc. No. 22, Nov. 13, 2009.)  In Rhode Island, incontestability clauses prevent

insurers from rescinding policies even on grounds of fraud.[7] <u>See</u> <u>Murray v. State Mut. Life Ins. Co.</u>, 48 A. 800, 800 (R.I. 1901) (rejecting insurer's argument that "fraud vitiates all contracts" and enforcing incontestability clause in the policy issued by the defendant); <u>see also</u> <u>Prudential Ins. Co. of Am. v.</u> <u>Tanenbaum</u>, 167 A. 147, 150 (R.I. 1933) (explaining that incontestability clauses bar defenses "to any action at law which might be brought . . . to enforce liability on the policies"). Hence, if the incontestability clauses are valid and enforceable, Plaintiffs may not justify canceling the annuities, or having them declared void, by claiming they were defrauded.

Grasping this problem, Plaintiffs ask the Court to erase the incontestability clauses from the contracts. Incontestability clauses that take effect immediately violate public policy, Plaintiffs say, because they tempt fraud. Plaintiffs cite decisions from other states that have found as much. <u>See, e.g.,</u> <u>Reagan v. Union Mut. Life Ins. Co.</u>, 76 N.E.

---

[7] With respect to incontestability clauses and several other issues discussed below, the parties (and the Court) recognize that Rhode Island law dealing with insurance provides a useful body of authority. Both Plaintiffs and Defendants cite cases and statutes governing insurance policies as persuasive authority. Thus, the conclusion that the annuities are not life insurance for purposes of § 27-4-27(a) does not require ignoring insurance law where relevant to the analysis of these issues.

217, 218 (Mass. 1905) ("If we treat [an incontestable clause that takes effect on the policy date] as intended to include fraud . . . we are of opinion that this part of the provision is against the policy of our law, and therefore void."); Welch v. Union Cent. Life Ins. Co., 78 N.W. 853, 854-55 (Iowa 1899) (finding an immediate incontestability provision ineffective against fraud claim).

While the Rhode Island Supreme Court has not spoken directly to this issue, no reasonable reading of that court's decisions, or Rhode Island statutory law, supports Plaintiffs' contention.  In this state, incontestability provisions are "for the benefit of the insured." Columbian Nat'l Life Ins. Co. v. Indus. Trust Co., 166 A. 809, 812 (R.I. 1933).  Accordingly, section 27-4-6.2(a) of the General Laws requires all policies to contain either two-year contestability periods or terms that the Rhode Island Department of Business Regulation ("DBR") considers "more favorable to policyholders." See R.I. Gen. Laws § 27-4-6.2(a).  From the consumer's perspective, a "more favorable" period during which the insurer could challenge the policy based on fraud or other grounds would be shorter, rather than longer. See R.I. Gen. Laws § 27-4-6.2(a).  Thus, it is reasonable to conclude that the DBR may authorize shorter lengths of time than the two-year default.  In fact, other provisions of the General

Laws allow the agency to review policies on a case-by-case basis.   See id. § 27-4-24 (providing for filing of policy forms).   This suggests that parties themselves may "stipulate for a shorter period of limitation than that provided by law" — subject to DBR approval — because it is more favorable to the insured.  Murray, 48 A. at 800.  As Murray demonstrates, this was acceptable before the passage of § 27-4-6.2(a).

Similarly, omitting the challenge period altogether would clearly be "more favorable" to the insured than the two-year default period.  Both the statutory and decisional law discussed above support the conclusion that parties can agree on their own to do just that.  At a minimum, there is no basis to assume the opposite: that the law contains an unstated public policy ban on making contracts incontestable from the date of issue.

For these reasons, the Court cannot strike the incontestability clauses from the annuities, and these clauses therefore serve to deflect claims to rescind the annuities or have them declared void because of fraud.

C.   Fraud and derivative claims

1.   Claims against the policy owners

The incontestability clauses also effectively knock out Plaintiffs' claims for fraud, conspiracy, and civil liability for crimes and offenses against the policy owners, who are the

22

beneficiaries of the policies, in cases 09-472 and 09-473.  "If a fraud defense to the validity of a policy is barred by incontestability, then a separate fraud action alleging the same grounds is also barred."  17 Lee R. Russ and Thomas F. Segalla, Couch on Insurance § 240:65 (3d ed. 2009).  Each of Plaintiffs' fraud-based tort claims relies upon the same underlying allegations.  Since Plaintiffs seek damages to cover their obligations under the policies, allowing these fraud-based claims to proceed against the owners would essentially permit an end-run around the incontestability clauses.  Each of the claims against the policy owners must therefore be dismissed.  See Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1048 (11th Cir. 2007) (noting that incontestability clauses "may apply . . . to bar . . . fraud-based claims (request for declaratory judgment, aiding and abetting fraud, conspiracy to commit fraud, and even RICO claims)"); Maslin v. Columbian Nat'l Life Ins. Co., 3 F. Supp. 368, 369 (S.D.N.Y. 1932) ("[I]n so far as the defendant relies upon an alleged conspiracy between one of its agents and Samuel Maslin [to commit fraud] . . . , there is no defense to the policies. The fraud, abhorrent as it is if the facts pleaded are true, has no legal significance once the period set by the incontestability clause has expired.").

An argument could be made that the incontestability clauses are special to insurance contracts, and should not be extended to the owners of annuities who are part and parcel, Plaintiffs say, of a fraudulent scheme.   This argument would suggest that because annuities such as the ones in this case are really investments, the owners should not, as a policy matter, be allowed to slink beneath the cloak of incontestability. Plaintiffs do not make this argument, no doubt because they argue in the first instance that the products here are contracts for insurance (an argument the Court has rejected).   The position has some obvious appeal, but cannot overcome the fact that the incontestability clauses appear in the contracts, and state no fraud exception.   Cf. First Interstate Bank of Billings v. United States, 61 F.3d 876, 877-78 (Fed. Cir. 1995) (allowing claim for fraud despite incontestability clause in a loan guarantee agreement, because the clause stated the guarantee was incontestable "except for fraud" under certain circumstances). And while the annuities are not life insurance, the two are cousins, and the familial similarity makes the insurance authority cited above quite persuasive.   In fact, the only case the Court has found to confront the question of why annuities contain incontestability clauses, Newton v. N.Y. Life Ins. Co., 325 F.2d 498 (9th Cir. 1963), supports this view.   The answer,

the court in <u>Newton</u> found, is that the clauses were designed to "reassure prospective policy holders" that the annuity would not be "disputed by the insurer many years after the contract had been issued." <u>Id.</u> at 502 (citation omitted).

Thus, according to <u>Newton</u>, the policy rationale underlying incontestability clauses is the same for both insurance and annuities. In either case, the provision protects the policy holder, not the insurer.[8]   See   <u>id.</u>   This strengthens the conclusion that incontestability clauses in annuities have the same effect as those contained in insurance contracts and, based on the holdings discussed above, must shield the owners from any fraud-based claims.

    2.   <u>Fraud claims against the sponsors, agents, and brokers</u>

Defendants initially seek blanket immunity beneath the cover of the incontestability clauses.   But unlike Harry Potter's "Invisibility Cloak," which could conceal not only

---

[8] The court in <u>Newton</u> stated that incontestability clauses in annuities are "for the benefit of the annuitant," but it is reasonable to assume it did not contemplate the possibility that the owner would be different from the annuitant.   <u>Newton v. N.Y. Life Ins. Co.</u>, 325 F.2d 498, 502 (9th Cir. 1963) (citation omitted).   The thrust of the court's holding was that incontestability clauses benefit the consumer as opposed to the insurer, in either annuities or insurance policies.   See <u>id.</u>

Harry, but anyone who wore it,[9] "[t]he benefits of an incontestable clause can be availed of only by an insured or his or her beneficiary, and cannot be invoked by a stranger to the contract."  17 Russ & Segalla, supra, § 240:10.  The clauses thus have no effect on the fraud claims against the sponsors, agents, and brokers, each of which are discussed below. Defendants have cited no persuasive authority in which a court has extended the coverage of an incontestability clause to anyone but the insured or the owner of a policy, and the Court has found none.

Defendants, in the alternative, assert various other grounds on which the fraud claims should be dismissed; all of these argument fail to carry the day.

a.   Rule 9(b) requirements

Defendants fault Plaintiffs for failing to specify the "who" and "what" of the alleged fraudulent scheme in their Complaints, as required by Rule 9(b).  Alternative Sys., 374 F.3d at 29.  This argument fails, because the Complaints do satisfy the heightened pleading requirements for fraud.

---

[9] Moreover, as Dumbledore observed: "[T]he true magic of [the Invisibility Cloak], of course, is that it can be used to protect and shield others as well as its owner."  J.K. Rowling, Harry Potter and the Deathly Hallows 716 (Scholastic 2007).

"To establish a prima facie case of common law fraud in Rhode Island the plaintiff must prove that the defendant made a false representation intending thereby to induce plaintiff to rely thereon, and that the plaintiff justifiably relied thereon to his or her damage." Zaino v. Zaino, 818 A.2d 630, 638 (R.I. 2003) (internal quotation marks and citation omitted). Defendants attack the Complaints for lumping all of them together when describing the alleged "false representations" and omissions. See 2 Jeffrey A. Parness & Jerry E. Smith, Moore's Federal Practice § 9.03[1][f] (2010) ("If a claim involves multiple defending parties, a claimant may usually not group all claimed wrongdoers together in a single set of allegations."). The Complaint in case number 09-549 provides a characteristic example:

> Caramadre, Radhakrishnan, Estate Planning Resources, [and] Maggiacomo . . . acted in concert to submit the applications identified herein, containing intentionally omitted . . . information concerning the respective annuitants' health conditions, the limited life expectancies of the annuitants, the payments to the annuitants, and the absence of a relationship between the annuitants and the owners and beneficiaries of the annuities with Maggiacomo . . . .

(549 Compl. ¶ 119.)

Reading the Complaints in full, the fact that they state Defendants "acted in concert" is not a fatal flaw. (See, e.g., 549 Compl. ¶ 119.) The Complaints assert that the STAT scheme

is a way to fleece the insurers for death benefits by hiding the annuitants' imminent demise.  Together, the Counts for fraud and civil conspiracy (see, e.g., 549 Compl. Counts I, V), along with the factual allegations supporting those Counts, go into enough detail about the alleged conspiracy, and each Defendant's role, to explain the origin of the alleged duty to tell Plaintiffs about the STATs.[10]  As in a criminal conspiracy, participants in a civil conspiracy need not know everything their co-conspirators know, or participate in every wrongful act, to be found liable for the ultimate fraud.  See Miller v. Holzmann, 563 F. Supp. 2d 54, 80 n.13 (D.D.C. 2008) (discussing liability under the False Claims Act, and stating "once [a] conspiracy has been formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy.  A

_____

[10] For instance, Caramadre "orchestrated" the STAT scheme, and brought in investors.  (See, e.g., 472 Compl. ¶¶ 14-17; 502 Compl. ¶¶ 14-17; 549 Compl. ¶¶ 13-16; 564 Compl. ¶¶ 13-16.) Estate Planning Resources is allegedly Caramadre's business, which he used in connection with the flyers advertising "Program[s] for the Terminally Ill." (See, e.g., 472 Compl. ¶ 18; 502 Compl. ¶ 18; 549 Compl. ¶ 17; 564 Compl. ¶ 17.) The Complaints state that Radhakrishnan either "identified" terminally ill annuitants (see, e.g., 472 Compl. ¶ 24; 502 Compl. ¶ 24), or "recruited" them (see, e.g., 549 Compl. ¶ 22; 564 Compl. ¶ 22).  The agents, allegedly acting in an agency capacity on behalf of the brokers, then furnished the annuity applications, which they "would sign and submit" to Plaintiffs. (See, e.g., 472 Compl. ¶ 26; 502 Compl. ¶ 26; 549 Compl. ¶¶ 25, 42, 59; 564 Compl. ¶¶ 25, 42, 57.)

conspirator need not participate actively in or benefit from the wrongful action in order to be found liable . . . .") (quoting Halberstam v. Welch, 705 F.2d 472, 481 (D.C. Cir. 1983) (discussing similarities between civil and criminal conspiracies)).  Accordingly, at this point in the litigation, it does not matter that Plaintiffs cannot recite, for instance, who filled out which portions of the applications, or who mailed them.  See Airport Boulevard Apartments, Ltd. v. NE 40 Partners, Ltd. (In re NE 40 Partners, Ltd.), 411 B.R. 352, 366 (Bankr. S.D. Tex. 2009) ("Rule 9(b) does not work to penalize a plaintiff merely because he was not privy to, and, therefore, cannot plead the details of, the inner workings of a group of defendants who allegedly acted in concert to defraud him.") (citation omitted); accord Deere & Co. v. Zahm, 837 F. Supp. 346, 350 (D. Kan. 1993) (finding a complaint for fraud and civil conspiracy sufficiently pleaded).  The point is that the applications were misleading, and all Defendants allegedly knew how the scheme operated and each played a specified role in it; therefore, it is alleged, each should have spoken up, and committed fraud by not doing so.

In addition, with respect to the agents, Plaintiffs go a step further.  They claim that, by signing the annuity applications, the agents affirmed they were "the agent[s] who

sold the [a]nnuit[ies]," but that this was false. (See, e.g., 472 Compl. ¶ 43; 502 Compl. ¶ 44; 549 Compl. ¶ 122; 564 Compl. ¶ 77.)   This allegation is sufficiently specific when read in conjunction with the applications themselves, which are attached to the Complaints as exhibits.   Above the signature line for agents, each application form declares that the agent has investigated the appropriateness of the investment for the consumer, and on that basis has certified the policy as reasonable for the consumer's needs.   (See, e.g., 472 Compl. Ex. C at 10.)   But, in fact, according to the Complaints, the agents did no such thing, and had they performed any investigation, could never have so certified.

In the aggregate, all the allegations discussed above serve the goals of Rule 9(b) to "provide a defendant with fair notice" of the claim and discourage baseless actions.   Suna v. Bailey Corp., 107 F.3d 64, 68 (1st Cir. 1997).

b.   Materiality

Defendants next attack the more fundamental question of whether any of the alleged omissions and misrepresentations was material.   Yet, even without any extant insurable interest requirement, Plaintiffs nevertheless allege a series of omissions that, if proven, could be found material by a jury.

i. The insurers' duty of inquiry

Defendants' first strategy is to emphasize the absence of any questions about the owner's relationship to the annuitant, or the annuitant's health status, on Plaintiffs' application forms.   Anything Plaintiffs did not ask about cannot be material, according to Defendants.   This, they say, is because the insured "has no duty [to disclose information] where the application makes no specific inquiries."   6 Russ & Segalla, supra, § 84:2.

It is true that the general rule "appears to assume that the insured or applicant does not have reason to know of the information's materiality apart from whether the insurer makes an inquiry. Such knowledge, combined with knowledge that the insurer is ignorant of the information, generally would impose a duty to disclose."   6 Russ & Segalla, supra, § 84:2.   The general rule, however, is not without exception.   As at least one decision in this District has recognized, many state courts allow claims for "[f]raudulent concealment . . . even without inquiry concerning the concealed material facts by the insurer." Putnam Res. v. Pateman, 757 F. Supp. 157, 162 n.1 (D.R.I. 1991); see Lighton v. Madison-Onondaga Mut. Fire Ins. Co., 106 A.D.2d 892, 892-93 (N.Y. App. Div. 1984) (allowing a claim for fraudulent concealment based on omitting the fact that fires had

31

occurred in the plaintiffs' basement several months before applying for insurance, even though "plaintiffs were asked no question with relation to prior fires"); Sun Ins. Co. of N.Y. v. Hercules Sec. Unlimited, Inc., 195 A.D.2d 24, 30 (N.Y. App. Div. 1993) (affirming judgment on claim for fraudulent concealment even though "the insured ha[d] not been asked" about the concealed fact that the insured planned to steal the insured assets); see also Harrison State Bank v. U.S. Fid. & Guar. Co., 22 P.2d 1061, 1064 (Mont. 1933) (stating that "any concealment of a material fact known to a party, increasing the ordinary risk, would be deemed . . . fraudulent," and explaining that the applicant for bank insurance knew of a planned robbery that law enforcement intended to allow in an attempt to catch the criminals).

While the Rhode Island Supreme Court has not addressed the issue directly, it has, as Defendants concede, recognized fraud claims based on concealment. See Guilbeault v. R.J. Reynolds Tobacco Co., 84 F. Supp. 2d 263, 269 (D.R.I. 2000) (citing Home Loan & Inv. Ass'n. v. Paterra, 255 A.2d 165, 168 (R.I. 1969). That recognition, combined with the decisions cited above finding insurance fraud where applicants hid information the insurer did not request, indicates that the Rhode Island Supreme Court would recognize a very narrow exception to the general

32

rule that the insurance company must ask about facts to make them material.   The exception, in its most limited form, can be simply stated as follows: if the non-disclosure is such that it amounts to fraud, then it surely must be material.[11]   That is, the rule that assumes (for the benefit of the insured) that insurers must ask in order for the information to be material cannot be used to facilitate or promote common law fraud.   This would doubtless violate public policy, because it would cause a policy-based rule designed to protect insured parties to swallow the general rule of law that forbids fraud.   The Court therefore rejects the argument that any information Plaintiffs did not demand on the annuity applications is immaterial as a matter of law.[12]

---

[11] The exception cannot, however, be so narrow as to require Defendants to be convicted of the crime of fraud for their omissions to be considered material.   Yet, at this time, the Court need not define the precise contours of the exception that a jury might eventually have to consider.   For now, it is sufficient to conclude that the lack of inquiry on Plaintiffs' part does not preclude materiality.

[12] Defendants argue that Testa v. Norfolk & Dedham Mut. Fire Ins. Co., 764 A.2d 119, 121 (R.I. 2001) confirms their position that the insurer must ask about a fact to make it material. They over-read the case.   In rejecting an insurer's fraud claim, the court in Testa noted that no "inquiry was made" of the insured about an allegedly concealed fact.   Testa, 764 A.2d at 121.   Yet, the defendant's policy had been transferred from one carrier to another without any requirement to re-apply for coverage.   The court stressed that the original representations made to the transferor "did not constitute an application" to

33

ii. Alleged omissions and misrepresentations

Rhode Island courts allow actions for fraudulent concealment in circumstances where the defendant bears "a duty to speak." Home Loan, 255 A.2d at 168. Whether or not the duty arises — in other words, whether a fact is material, such that it must be disclosed — depends on the "circumstances of [the] case." Id. at 168. The duty generally obligates a party to divulge facts that, if withheld, render other affirmative representations misleading. See Nisenzon v. Sadowski, 689 A.2d 1037, 1046 (R.I. 1997) (finding a letter from an attorney that "not only . . . fail[ed] to disclose [the attorney's] ownership" of disputed property, but also "affirmatively sought to induce" the recipients to take no action against his client, supported a fraud claim).

Under this standard, Plaintiffs' fraud claims clear the hurdle of Defendants' motions to dismiss. True, in the absence of any insurable interest requirement, the theory that Defendants concealed a statutory violation holds no water.[13]

---

the plaintiff-transferee. Id. Thus, unlike in this case, it was questionable whether the defendant made any representations at all to the plaintiff (instead of only to the transferor).

[13] Plaintiffs also allege that the payments to the annuitants violate the anti-kickback rules established by R.I. Gen. Laws § 27-8-7 (2010). However, as with the insurable interest provision in § 27-4-27, the anti-kickback statute is not written

Yet, there are more than enough fragments of allegedly withheld information that remain to meet or exceed the materiality threshold.   Specifically, Plaintiffs assert that Defendants hid: (i) the recruitment of annuitants who faced imminent death (see, e.g., 471 Compl. ¶¶ 24-25; 472 Compl. ¶ 23; 564 Compl. ¶¶ 22, 39, 56); (ii) in some cases, the annuitants' ignorance of the terms of the policies (see, e.g., Am. Compl., C.A. no. 09-470, Doc. No. 9, Oct. 16, 2009 (hereinafter "470 Compl.") ¶ 21; 471 Compl. ¶ 39; 473 Compl. ¶ 56); (iii) the payments to some annuitants to sign the applications (see, e.g., 472 Compl. ¶ 44; 471 Compl. ¶ 39; 502 Compl. ¶ 45); (iv) in some cases, the forgery or possible forgery of annuitants' signatures (see, e.g., 470 Compl. ¶ 21-24; 564 Compl. ¶ 24); and (iv) with respect to the agents, the fact that they were not the agents who sold the policies, in contradiction of representations on the applications that they brokered the annuity sales and deemed them appropriate (see, e.g., 472 Compl. ¶ 43; 502 Compl. ¶ 44; 564 Compl. ¶ 77).

---

to govern annuities.   By its terms, it only prohibits payments in connection with "contract[s] for insurance" of various types, not annuities.  R.I. Gen. Laws § 27-8-7.   In the Court's view, this language does not include annuities, particularly in light of the consistent statutory distinction between annuities and insurance in Rhode Island, discussed above.   Nevertheless, as explained in this section, the fact that the payments to the annuitants could not have violated § 27-8-7 does not spoil Plaintiffs' fraud claims.

This last point bears a further comment: Plaintiffs' pleadings focus in part on the agents as the source of what could be considered either omissions or affirmative misrepresentations. Each annuity contains a signature section for the agent with the following text printed immediately above it:

> I HAVE MADE REASONABLE EFFORTS TO OBTAIN INFORMATION CONCERNING THE CONSUMER'S FINANCIAL STATUS, TAX STATUS, INVESTMENT OBJECTIVES AND SUCH OTHER INFORMATION USED OR CONSIDERED TO BE REASONABLE IN MAKING THE ANNUITY RECOMMENDATION AND FIND THE ANNUITY BEING APPLIED FOR APPROPRIATE FOR HIS/HER NEEDS.

(564 Compl. Ex. G at 10.) Plaintiffs, however, contend the agents did not have "any substantive involvement in selling the annuities," but were merely go-betweens for the sponsors. The sponsors needed these particular annuity applications, which could only be sold by licensed brokers, for their pre-arranged investors. (Id.) A jury could reasonably find that those facts, if proven, were material, because shrouding them rendered the statements printed above misleading.[14]

---

[14] The agents try to duck the effect of those statements by uncorking, in the middle of their fraud argument, the issue of whether they owed any duty to Plaintiffs as a matter of agency law. That issue could be relevant for negligence claims, see Gen. Acc. Ins. Co. of Am. v. Am. Nat'l Fireproofing, Inc., 716 A.2d 751, 756-57 (R.I. 1998) (finding that insurance brokers owed duties both to the insurer and the insured), but for fraud, the relevant duty is the duty to disclose, which turns only on

Simply put, according to Plaintiffs, Defendants collectively did not tell them they were conspiring to exploit a loophole in Plaintiffs' annuity products.  As explained above, Plaintiffs' theory in this case is that each of the parties understood the nature of the fraudulent scheme, and each had his or her part to play and played it.  Thus, much like a criminal enterprise, the fraud was the product of a group effort.  See Miller, 563 F. Supp. 2d at 81.  Under these circumstances, evidence substantiating the allegations would be sufficient to create a jury question as to whether the information Defendants withheld was material.  Cf. Affleck v. Potomac Ins. Co., 140 A. 469, 470 (R.I. 1928) (explaining that "[s]ometimes questions of materiality are for the jury," although the court may find misrepresentations on an insurance application to be material as a matter of law); Smith v. Beaumier, 703 A.2d 1104, 1107 (R.I. 1997) (finding sufficient evidence in the record from which a jury could reasonably have concluded that the defendant "made material misrepresentations"); In re Cabletron Sys., Inc., 311 F.3d 11, 36 (1st Cir. 2002) (reversing dismissal of fraud claims and noting that materiality would "present a question of fact for a jury").

---

the materiality of the omissions identified above.  It thus arises independently from any agency relationship.

c.   Scienter

Defendants   submit   that,   even   accepting   Plaintiffs'
allegations as true, they cannot prove the scienter element of
fraud:   that   Defendants   "inten[ded]"   to   deceive   Plaintiffs.
Zaino, 818 A.2d at 638.   The sponsors' argument on this point
again   rests   on   their   objection   that   none   of   the   alleged
omissions was material.   They do not dispute that the Complaints
all allege they knowingly withheld the facts discussed above.
Rather,   they   assert   it   was   not   inappropriate   to   stay   silent
about those facts, because the facts were immaterial as a matter
of law.    For   the   reasons   discussed   at   length   above,   this
argument must be rejected.

The   agents   and   brokers,   for   their   part,   argue   that   the
Complaints fail to allege they knowingly concealed information
or lied.   The agents fasten on the fact that Plaintiffs say they
had no "substantive involvement" in selling the policies (see,
e.g., 564 Compl. ¶ 77), and that, in some cases, the annuitants
"had never met" the agents before signing the applications (see,
e.g., 472 Compl. ¶ 34).   However, the Complaints declare that
the agents "knew the . . . omissions in the applications"
described above were "misleading." (See, e.g., 472 Compl. ¶ 54;
502 Compl. ¶ 47; 549 Compl. ¶ 125; 564 Compl. ¶ 80.)   Plus,
Plaintiffs allege that it was the sponsors, not the agents, who

identified the buyers, and who solicited the annuitants to sign the applications.  See supra n.10.  At a minimum, these facts, if proven, would make it unlikely that the agents had actually brokered the sales; this, in turn, would provide a "basis for inferring" that each agent knew it was misleading to proclaim on the application that he had made the annuity recommendation and found the investment appropriate.  N. Am. Catholic Educ., 567 F.3d at 13.

Because the Complaints properly allege scienter on the part of the agents, the brokers cannot escape liability by pleading ignorance.  They may be vicariously liable for fraud if Plaintiffs prove the allegations that the agents acted in an agency capacity for the brokers when delivering the applications.  See In re Atl. Fin. Mgmt., Inc., 784 F.2d 29, 32 (1st Cir. 1986) (explaining the basis for vicarious liability for fraud).[15]

---

[15] Defendants also argue Plaintiffs cannot prove the justifiable reliance element of fraud.  They argue big insurance companies are too sophisticated to justifiably rely on the absence of information they did not ask for.  However, as noted, the insurers' lack of inquiry does not rule out fraud. Furthermore, sophistication does not preclude reliance.  See Kenda Corp. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 227 (1st Cir. 2003) (rejecting an argument that the principal of a corporation was "sophisticated" and therefore could not have reasonably relied on misrepresentations by a potential business partner).

3.   <u>Claims   for   conspiracy,   civil   liability   for
     crimes,   and   unjust   enrichment   against   the
     sponsors, agents, and brokers</u>

According   to   Defendants,   the   conspiracy   and   unjust
enrichment   claims   cannot   prevail,   because   each   springs   from
Plaintiffs'   deficient   fraud   claims.     A   conspiracy   requires
"specific   intent   to   do   something   illegal   or   tortious."
<u>Guilbeault</u>,   84   F.   Supp.   2d   at   268.     Unjust   enrichment   requires
circumstances   that   make   it   "inequitable   for   a   defendant   to
retain   [a]   benefit"   gained   from   a   plaintiff,   <u>Bouchard v. Price</u>,
694   A.2d   670,   673   (R.I.   1997)   (internal   citation   omitted),   such
that   "the   enrichment   to   the   defendant   [is]   unjust,"   <u>R&B   Elec.
Co. v. Amco Constr. Co.</u>,   471   A.2d   1351,   1356   (R.I.   1984).     There
are   no   cognizable   allegations   that   Defendants   have   done   anything
wrongful   or   tortious,   they   insist,   because   Plaintiffs   have
failed   to   plead   fraud   adequately.     However,   since   the   fraud
claims   against   the   sponsors,   agents   and   brokers   may   proceed   for
the   reasons   already   discussed,   the   conspiracy   and   unjust
enrichment   Counts   may   follow   against   those   parties.

Plaintiffs'   claims   for   civil   liability   for   crimes   and
offenses,   on   the   other   hand,   trip   over   a   statutory   barrier
similar   to   the   one   that   obstructs   their   insurable   interest
argument.     The   insurance   fraud   statute   on   which   the   claims
depend   only   criminalizes   deceit   in   connection   with   "any

application for the issuance of an insurance policy." R.I. Gen. Laws § 11-41-29(b)(1); see R.I. Gen. Laws § 9-1-2 (providing civil liability for victims of crimes). The words "insurance policy" are even less susceptible to the interpretation that they include annuities than the words "insurance contract" in § 27-4-27(a). Again, given the statutory division between insurance and annuities in Rhode Island law, the Court declines to transpose the rules for insurance policies onto annuities. Defendants may have defrauded Plaintiffs, and thereby violated some other part of the state criminal code; but § 11-41-29 cannot serve as a basis for civil liability in these cases. [16]

---

[16] In their opposition to Defendants' motions, Plaintiffs coin two new theories as to why the contracts are void: forgery and fraud in the factum. The latter occurs when someone is "tricked into signing an instrument without knowledge of its true nature or contents." Vasapolli v. Rostoff, 39 F.3d 27, 35 (1st Cir. 1994). It renders a contract "void and not merely voidable." R.I. Depositors Econ. Protection Corp. v. Bowen Court Assoc., 763 A.2d 1005, 1009 (R.I. 2001). Forgery may have the same result, if for no other reason than that it is one instance in which fraud in the factum may occur. See Giannone v. Ayne Inst., 290 F. Supp. 2d 553, 563 (E.D. Pa. 2003). The twist here is that, if either claim were successful, this could rope the owners back into the lawsuits in cases 09-472 and 09-473: they could no longer rely on the incontestability clauses, which never would have come into effect. However, none of the Complaints articulates any separate claims for relief based on forgery or fraud in the factum — which, as species of fraud, are subject to Rule 9(b). Instead, the only reasonable reading of the Complaints is that they plead garden-variety claims of fraud in the inducement: concealing the annuitants' ignorance of the policies, and the possible forgery of their signatures, allegedly induced Plaintiffs to issue the annuities. See R.I.

D.   Contract claims

1.   Breach of contract

A necessary consequence of the Court's preservation of the fraud claims against the agents is that the breach of contract claims against the brokers also cannot be dismissed.  Plaintiffs entered agreements with each of the brokers setting conditions for selling their insurance and annuity products.  If proven, the fraud could create liability under at least two contract provisions cited in the Complaints.  First, Western Reserve alleges that its agreements obligate the brokers to indemnify Western Reserve for "fraudulent . . . acts" of the brokers' "employees . . . or agents" when selling Western Reserve products.  (564 Compl. ¶ 88; see 470 Compl. ¶ 46; 472 Compl. ¶ 61; 473 Compl. ¶ 64; 502 Compl. ¶ 54.)  Second, both Transamerica's and Western Reserve's contracts require the brokers to "supervise" their agents in selling Plaintiffs' products.  (471 Compl. ¶ 62; see 549 Compl. ¶ 132.)  If the

_Depositors Econ. Prot. Corp. v. Duguay_, 715 A.2d 1278, 1280 (R.I. 1998) (distinguishing fraud in the inducement from fraud in the factum).  The Court's decision here is without prejudice to any motion for leave to amend the Complaints to add fraud in the factum or rescission on grounds of forgery as separate causes of action.  The Court takes no position at this time on the merits of such a motion, or on the question of whether such claims would in fact allow re-joining the owners to these cases by effectively negating the incontestability clause defense.  This issue, if it arises, would need to be fully briefed and argued.

agents engaged in fraud, this may allow Plaintiffs to establish that the brokers failed to supervise the agents.[17]

The brokers make no headway with objections to Plaintiffs' lack of specificity in pleading breach of contract, or failure to attach the relevant contracts to the Complaints. Plaintiffs have satisfied the relaxed pleading standards of Rule 8, which apply to claims for breach of contract. See 5 Charles Alan Wright and Arthur R. Miller, Federal Practice & Procedure § 1235 (3d ed. 2010) ("In pleading the existence of an express written contract, the plaintiff, at her election, may set it forth verbatim in the complaint, attach a copy as an exhibit, or plead it according to its legal effect.").

Leaders also falls short in asserting, for the first time in its reply memoranda, that the Complaints in cases 09-473 and 09-502 rely on an outdated agreement. Arguments "raised for the first time in reply briefs are procedurally barred." Weaver's Cove Energy, LLC v. R.I. Coastal Res. Mgmt. Council, 589 F.3d 458, 474 n.14 (1st Cir. 2009). Regardless, the Complaints say the agreement remains valid, and Western Reserve stated at oral argument that it stands by that assertion. Whatever the facts

---

[17] Given that the breach of contract claims must be allowed to go forward on the basis of the indemnification for fraud and supervision clauses, the Court need not decide whether any other provisions might ultimately create liability.

may eventually reveal about the status of the contract, the Court must accept Western Reserve's allegations as true for purposes of Defendants' motions.

     2.   <u>Breach of the duty of good faith and fair dealing</u>

    The Transamerica contracts include an express choice-of-law clause designating New York law as governing the terms of the agreement. (<u>See</u> Pl.'s Obj. to Mot. to Dismiss Ex. A at 3, ¶ 11(a), C.A. No. 09-549, Doc. No. 17 (Feb. 1, 2010).) New York law thus controls Transamerica's contract claims. <u>See DeCesare v. Lincoln Benefit Life Co.</u>, 852 A.2d 474, 481 (R.I. 2004) ("[C]hoice-of-law provisions are enforceable if the intention of the parties to stipulate to the jurisdiction is made clear by express language . . . ."); <u>see also Baker v. St. Paul Travelers Ins. Co.</u>, 595 F.3d 391, 392 (1st Cir. 2010) ("Because this court is sitting in diversity, we apply the choice of law rules of the forum state . . . ."). New York law "does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." <u>Harris v. Provident Life & Accident Ins. Co.</u>, 310 F.3d 73, 81 (2d Cir. 2002). Thus, Transamerica can only rely on its contract claims.

    Florida law governs the Western Reserve contracts, also pursuant to an express choice-of-law clause. (<u>See</u> Pl.'s Obj. to

Mot. to Dismiss Ex. A ¶ 15, C.A. No. 09-472, Doc. No. 37 (Feb. 1, 2010).) Florida law requires claims based on the implied duty of good faith and fair dealing to piggyback on the violation of a specific contractual provision. See Burger King Corp. v. Weaver, 169 F.3d 1310, 1318 (11th Cir. 1999) (explaining that under Florida law, an "action for breach of the implied covenant cannot be maintained . . . in the absence of breach of an express term of the underlying contract"). Since Western Reserve has viable claims for the breach of express contractual terms, as a matter of law it may proceed with its claims for violation of the implied covenant of good faith. See Nautica Int'l, Inc. v. Intermarine USA, L.P., 5 F. Supp. 2d 1333, 1340-41 (S.D. Fla. 1998) ("That action constituted an express breach of a term of an agreement between [plaintiff and defendant], and, therefore, plaintiff, as a matter law, may bring a claim for breach of implied covenant of good faith.").

E.   Negligence

Finally, Rhode Island law forbids Plaintiffs' negligence claims, because they do not assert any physical or emotional damages. The economic loss doctrine in this state prohibits parties who "have contracted to protect against potential economic liability" from recovering "purely economic damages" in tort claims. Franklin Grove Corp. v. Drexel, 936 A.2d 1272,

1275 (R.I. 2007) (quotation marks and citation omitted).
Plaintiffs are correct that the Rhode Island Supreme Court has
not applied the economic loss rule to service contracts, such as
the broker agreements at issue.   However, in this case, the
rationales for the rule apply, and the exception to it does not.

Some courts have recognized that the economic loss doctrine
preserves the distinction between tort and contract law, allows
sophisticated parties freedom to allocate economic risk by
contract, and enables the party best positioned to assess
economic risk to allocate it.   See Ins. Co. of N. Am. v. Cease
Elec. Inc., 688 N.W.2d 462, 470 (Wis. 2004).   Here, as a general
matter, permitting the contract claims and not the negligence
claims to move forward is consistent with these ends.   This
result enforces the allocations of risk Plaintiffs bargained for
in the agreements.   Indeed, Western Reserve's contracts
allegedly create an express remedy for negligence on the part of
the agents, which requires the brokers to indemnify Western
Reserve for any resulting losses.   (See, e.g., 564 Compl. ¶ 88.)
In addition, there is no dispute that Plaintiffs are
sophisticated corporations.   Therefore, the exception to the
economic loss rule for ordinary "consumers [who] deal with
commercial entities" in Rhode Island does not apply.   See
Rousseau v. K.N. Constr., Inc., 727 A.2d 190, 193 (R.I. 1999).

Accordingly, judging by the purposes of the economic loss doctrine, the Court has little trouble concluding that the rule prevents Plaintiff's negligence claims, notwithstanding the fact that the state's high court has not yet had occasion to apply the rule to service contracts.  Cf. Maine Rubber Int'l v. Envtl. Mgmt. Group, Inc., 298 F. Supp. 2d 133, 137-38 (D. Me. 2004) (discussing various approaches to the economic loss doctrine, and concluding that it would reach a contract for services under Maine law).  They must therefore be dismissed.[18]

III. Conclusion

For the reasons stated above, Defendants' motions are GRANTED in part and DENIED in part.  All Counts for rescission, declaratory judgment that the contracts are void, civil liability for crimes and offenses, and negligence are dismissed. The Counts for fraud and civil conspiracy are dismissed as against ADM in case 09-472 and DK in case 09-473.  Finally, the

---

[18] Plaintiffs contend that the "close economic relationship" between the parties allows bypassing the economic loss rule. However, in the case cited as authority for that argument, there was no privity of contract between the plaintiff and the defendant, unlike in these disputes.  See Forte Bros., Inc. v. Nat'l Amusement, Inc., 525 A.2d 1301, 1303 (R.I. 1987) (finding an architect owed a duty of care to a third-party general contractor and that there is "no requirement of privity . . . to maintain an action in tort").  Forte Brothers also does not announce any general exception to the economic loss doctrine. Rather, its holding was merely that an architect owed a duty of care to a general contractor working on the same project even in the absence of a contract between the two.  See id. at 1303.

Counts for breach of the duty of good faith and fair dealing in cases 09-471 and 09-549 are both dismissed.  The remaining Counts may proceed.

IT IS SO ORDERED.

*/s/ William E. Smith*

William E. Smith
United States District Judge
Date:  June 2, 2010