```
_____
                                )
WESTERN RESERVE LIFE ASSURANCE  )
CO. OF OHIO,                    )
          Plaintiff,            )
                                )
      v.                        ) C.A. No. 09-470 S
                                )
JOSEPH CARAMADRE; RAYMOUR        )
RADHAKRISHNAN; ESTATE PLANNING   )
RESOURCES, INC.; HARRISON CONDIT;)
and FORTUNE FINANCIAL            )
SERVICES, INC.,                  )
                                )
          Defendants;           )
_____)
                                )
TRANSAMERICA LIFE INSURANCE      )
COMPANY,                         )
          Plaintiff,            )
                                )
      v.                        ) C.A. No. 09-471 S
                                )
JOSEPH CARAMADRE; RAYMOUR        )
RADHAKRISHNAN; ESTATE PLANNING   )
RESOURCES, INC.; ESTELLA RODRIGUES;)
EDWARD MAGGIACOMO, JR.; LIFEMARK )
SECURITIES CORP.; and            )
PATRICK GARVEY,                  )
          Defendants;           )
_____)
                                )
WESTERN RESERVE LIFE ASSURANCE  )
CO. OF OHIO,                    )
          Plaintiff,            )
                                )
      v.                        ) C.A. No. 09-472 S
                                )
JOSEPH CARAMADRE; RAYMOUR        )
RADHAKRISHNAN; ESTATE PLANNING   )
RESOURCES, INC.; ADM ASSOCIATES, )
LLC; EDWARD HANRAHAN; THE LEADERS )
GROUP, INC.; and CHARLES BUCKMAN, )
          Defendants;           )
_____)
```

```
_____
                                     )
WESTERN RESERVE LIFE ASSURANCE       )
CO. OF OHIO,                         )
          Plaintiff,                 )
                                     )
     v.                              ) C.A. No. 09-473 S
                                     )
JOSEPH CARAMADRE; RAYMOUR            )
RADHAKRISHNAN; ESTATE PLANNING       )
RESOURCES, INC.; DK LLC; EDWARD      )
HANRAHAN; THE LEADERS GROUP, INC.;   )
and JASON VEVEIROS,                  )
          Defendants;                )
_____    )
                                     )
WESTERN RESERVE LIFE ASSURANCE       )
CO. OF OHIO,                         )
          Plaintiff,                 )
                                     )
     v.                              ) C.A. No. 09-502 S
                                     )
JOSEPH CARAMADRE; RAYMOUR            )
RADHAKRISHNAN; ESTATE PLANNING       )
RESOURCES, INC.; NATCO               )
PRODUCTS CORP.; EDWARD HANRAHAN;     )
and THE LEADERS GROUP, INC.,         )
          Defendants;                )
                                     )
_____    )
                                     )
                                     )
TRANSAMERICA LIFE INSURANCE          )
COMPANY,                             )
          Plaintiff,                 )
                                     )
     v.                              ) C.A. No. 09-549 S
                                     )
LIFEMARK SECURITIES CORP.;           )
JOSEPH CARAMADRE; RAYMOUR            )
RADHAKRISHNAN; ESTATE PLANNING       )
RESOURCES, INC.; and EDWARD          )
MAGGIACOMO, JR.,                     )
          Defendants;                )
                                     )
_____    )
```

```
_____
                                    )
WESTERN RESERVE LIFE ASSURANCE      )
CO. OF OHIO,                        )
        Plaintiff,                  )
                                    )
     v.                             ) C.A. No. 09-564 S
                                    )
JOSEPH CARAMADRE; RAYMOUR           )
RADHAKRISHNAN; ESTATE PLANNING      )
RESOURCES, INC.; HARRISON CONDIT;   )
and FORTUNE FINANCIAL               )
SERVICES, INC.,                     )
        Defendants.                 )
_____)
```

### OPINION AND ORDER

WILLIAM E. SMITH, United States District Judge.

Plaintiffs Western Reserve Life Assurance Co. of Ohio ("Western Reserve") and Transamerica Life Insurance Company ("Transamerica") (collectively, "Plaintiffs")[1] filed these seven suits against various defendants, who are identified below, alleging that the defendants improperly engaged in "stranger-initiated annuity transactions" or STAT schemes.[2] Before the

---

[1] While there is only a single plaintiff in each action, Western Reserve or Transamerica, the Court refers to Plaintiffs (plural) except where it is necessary to distinguish between the two. Plaintiffs are represented by the same counsel and have filed consolidated briefs. The Court also understands that they are both part of the "Aegon Americas" companies.

[2] On February 18, 2011, the Court "linked" these cases for purposes of pretrial electronic filing only. (See Consolidation Order, C.A. No. 09-470, ECF No. 86.) As a result, all filings made after February 18, 2011 in each of the seven cases, with the exception of amended complaints, can be found on the electronic docket of case 09-470. The cases are not otherwise consolidated.

Court are Defendants Joseph Caramadre, Raymour Radhakrishnan, Estella Rodrigues, Harrison Condit, Estate Planning Resources, Inc., and ADM Associates, LLC's Motion to Dismiss the Newly Amended Complaints and Request for Reconsideration, filed in cases 09-470, 09-471, 09-472, 09-473, 09-502, 09-549, and 09-564; Defendant Edward Hanrahan's Motion to Dismiss and Request for Reconsideration, or, in the Alternative, for a More Definite Statement, filed in cases 09-472, 09-473, and 09-502; DK LLC's Motion for Dismissal of Third Amended Complaint, filed in case 09-473; and Fortune Financial's Motion to Dismiss Plaintiff's Second Amended Complaint, filed in cases 09-470 and 09-564.[3]

The movant-Defendants move to dismiss the newly amended complaints and for reconsideration of the Court's June 2, 2010 Opinion and Order (hereinafter "June 2 Order"), in which the Court granted in part and denied in part Defendants' previously-filed motions to dismiss. For the reasons set forth below, DK

---

[3] Plaintiffs note that Fortune Financial's motion to dismiss the second amended complaint is moot in light of Plaintiffs' third round of amendments, but, in the interest of efficiency, Plaintiffs do not object to the Court taking up the arguments presented in the context of the Third Amended Complaint. The Court, therefore, considers the arguments presented therein.

Moreover, by stipulation, Edward Maggiacomo joined his co-defendants' memoranda in support of their motions to dismiss. (See Stipulation, Apr. 18, 2011, C.A. No. 09-470, ECF No. 101.) The Court also considers the arguments set forth in Maggiacomo's motion to dismiss and request for reconsideration, which was filed after the Court's June 2, 2010 Opinion and Order and Plaintiffs' subsequent amendments. (See Mot. to Dismiss and Request for Recons. of Def. Edward L. Maggiacomo, Jr., C.A. No. 09-471, ECF No. 62.)

LLC's motion to dismiss is granted, and the other movant-Defendants' motions are granted in part and denied in part.

## I. Background[4]

The following background information is reprised from the Court's June 2 Order (with updates and alterations indicated by brackets):

The genesis of these cases is a scheme for annuity investments that Plaintiffs dub "stranger-initiated annuity transactions," or STATs. Because the Court must accept the alleged facts as true for purposes of Defendants' motions pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, it here provides an overview of the STATs drawn from the Complaints.

Defendant Joseph Caramadre is an attorney who specializes in reading the fine print of insurance and annuity products and

---

[4] On November 17, 2011, a grand jury returned a sixty-six count indictment against two of the defendants in this case, Joseph Caramadre and Raymour Radhakrishnan. (See generally Indictment, filed Nov. 17, 2011, D.R.I., Cr. No. 11-186 S.) The Indictment charges Caramadre and Radhakrishnan with wire fraud, mail fraud, conspiracy, identity fraud, aggravated identity theft, and money laundering. Caramadre is also charged with one count of witness tampering. While the Indictment and instant civil cases do share some overlap in the facts and scheme alleged, the Indictment is much broader and paints a picture of a scheme that, over a number of years, defrauded many insurance companies, as well as many terminally ill individuals and their families, and employed death-put bonds, corporate bonds, and variable annuities to do so. Of course, at this stage, these are only allegations, and for the Court's purposes, the criminal allegations have no bearing on the allegations set forth in these Complaints.

finding "loopholes." The one he discovered in these actions focused on two components of certain annuities sold by Plaintiffs. One, the annuities were variable, which means that premiums paid to obtain the policy could be invested in securities on behalf of the owner. Two, the annuities allowed the owner to elect a "death benefit." This option guaranteed the return of premiums upon the death of the annuitant, no matter what the market value of the policy was at that time.

Caramadre's insight was that policies with those two features invited riskless securities speculation. The annuitants would of course die at some point. If one could safely bet that would happen quickly, the annuities could be used to turn fast profits. Investors could make aggressive short-term trades without worrying about losses. Thus, the key to the strategy was finding terminally ill individuals, with a correspondingly short life expectancy, willing to be annuitants.

To find such individuals, Caramadre and his associates, including Defendant Raymour Radhakrishnan, began publicizing a "Program for the Terminally Ill" to hospice patients and workers. Flyers bearing the business name "Estate Planning Resources," a company allegedly controlled by Caramadre, promised cash payments to dying patients willing to do business with the company. Once either Caramadre or Radhakrishnan identified both a terminally-ill annuitant candidate and an

investor, they arranged for a licensed agent of an annuities broker to provide the annuity application. They then paid the sick patient to sign the application as the annuitant. In some instances, Plaintiffs claim, Caramadre, Radhakrishnan, or the agent actually forged the annuitant's signature. The investor would be designated as the owner and beneficiary on the application, and would pony up the cost of the policy.

Once completed, the insurer accepted the application and issued an annuity in which the owner had no relationship to the annuitant, other than through the alleged STAT itself. Within this broad framework, all Defendants fit into one of the following categories:

• "<u>Sponsors</u>" of the STAT scheme, a term the Court uses to refer to Caramadre and Radhakrishnan, who solicited the transactions, as well as their alleged company Estate Planning Resources ("EPR"). [They are named Defendants in each of the actions.[5]]

• <u>Annuity brokerage companies</u>[, or the "Brokers"], who sell Plaintiffs' annuities. The broker in case numbers 09-470 and 09-564 is Fortune Financial Services, Inc. ("Fortune"); in 09-471 and 09-549, it is Lifemark Securities Corporation ("Lifemark"); and in 09-472, 09-473, and 09-502, it is The Leaders Group ("Leaders").

• <u>Agents</u> of the brokers: the individuals who are licensed to sell annuities and provided the policies at issue at the request of Caramadre and/or Radhakrishnan. Fortune's agent, named as a Defendant in cases 09-470 and 09-564, is

---

[5] [Caramadre and Radhakrishnan were not named defendants in the Complaint initially filed in C.A. No. 09-470; however, Plaintiff Western Reserve added Caramadre and Radhakrishnan as defendants in that case in the Second Amended Complaint, filed on September 7, 2010.]

Harrison Condit; Lifemark's agent, named in 09-471 and 09-549, is Edward Maggiacomo; Leaders's agent, named in 09-472, 09-473, and 09-502, is Edward Hanrahan.

• Owners of annuities in the four actions in which the annuitant is still living, cases 09-470 through 09-473.[6] These are the people or corporations who paid premiums for the policies, and stand to redeem the proceeds because they are also designated as the beneficiaries. In case number 09-470, the owner is Conreal LLC ("Conreal"); in 09-471, it is Estella Rodrigues; in 09-472, it is ADM Associates, LLC ("ADM"); and in 09-473, it is DK LLC ("DK"). In the other three cases, the annuitants are deceased, and the owners are not named as Defendants. [Since the June 2 Order, Owners Conreal and DK have both agreed to the rescission of their contracts, Conreal is no longer listed as a defendant in 09-471, and Natco Service Corp., the owner of the annuity at issue in 09-502, has been named as a defendant in that case. Western Reserve does not assert any claims or seek damages against Natco Service Corp.]

• Annuitants: the terminally ill individuals who serve as measuring lives for the annuities in cases 09-470 through 09-473. In 09-470, the annuitant is Anthony Pitocco; in 09-471, it is Patrick Garvey; in 09-472, it is Charles Buckman; and in 09-473, it is Jason Veveiros. [Plaintiffs no longer bring claims against any of the Annuitants, but they remain named in the captions of cases 09-471, 09-472, and 09-473.]

W. Reserve Life Assur. Co. of Ohio v. Conreal LLC, 715 F. Supp. 2d 270, 273-75 (D.R.I. 2010) (internal citations to the record omitted).

In the June 2 Order, the Court dismissed the following counts for failure to state a claim: all counts for rescission, declaratory judgment that the contracts are void, civil liability for insurance fraud, and negligence; the fraud and

---

[6] [This statement is current through the June 2 Order, but the Court cannot say with certainty whether these annuitants are still living as of the date of this Opinion and Order.]

civil conspiracy counts against owners ADM and DK in cases 09-472 and 09-473, respectively; and the counts against Lifemark for breach of the duty of good faith and fair dealing in cases 09-471 and 09-549. Id. at 290.

Since the June 2 Order, Plaintiffs have filed at least one round of amended complaints in each case, adding claims of: civil liability for forgery (in cases 09-470, 09-549, 09-564); fraud in the factum (in all cases except 09-472 and 09-502[7]); and claims of breach of contract and breach of the duty of good faith and fair dealing against Agents Condit and Hanrahan (in cases 09-470, 09-472, 09-473, 09-502, and 09-564).[8] The operative Complaints are now the Amended Complaint in 09-502 ("502 Complaint"); the Second Amended Complaints in cases 09-472 ("472 Complaint"), 09-549 ("549 Complaint"), and 09-564 ("564 Complaint"); and the Third Amended Complaints in cases 09-470 ("470 Complaint"), 09-471 ("471 Complaint"), and 09-473 ("473 Complaint"). Combined, the Complaints assert against some or

_____

[7] According to Plaintiffs, they did not add a fraud in the factum count to the Complaints in 09-472 and 09-502 because the Annuitants in those cases appear to have known about the circumstances surrounding their participation in the STAT scheme.

[8] Plaintiffs note that similar claims were not brought against Maggiacomo in cases 09-471 and 09-549 because Transamerica has not established that it had a direct contractual relationship with Maggiacomo. Plaintiffs do allege, however, that Maggiacomo worked for a broker (Lifemark) who had a contractual relationship with Plaintiffs.

all Defendants the following claims for relief: (1) fraud in the factum; (2) fraudulent inducement; (3) declaratory judgment; (4) rescission; (5) breach of contract; (6) breach of the duty of good faith and fair dealing; (7) civil liability for crimes and offenses; (8) unjust enrichment; and (9) civil conspiracy.[9]

Defendants[10] move for reconsideration of the June 2 Order as to the claims of fraudulent inducement, unjust enrichment, and civil conspiracy, and they move for dismissal of the Complaints pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted as to the claims of fraud in the factum; declaratory judgment; rescission; breach of contract; breach of the duty of good faith and fair dealing; and civil liability for crimes and offenses.

## II. Discussion

### A. The Legal Standard

In reviewing a motion to dismiss, the Court must "accept the well-pleaded facts as true, viewing factual allegations in the light most favorable to the plaintiff." <u>Rederford v. U.S.</u>

---

[9] The Court lists here only claims that survived the June 2 Order, newly pleaded claims, and claims that Plaintiffs attempt to revive in the amended complaints. Plaintiffs re-allege in their amended complaints the dismissed counts in order to preserve them for appellate review, but they are not discussed in this decision, except where Plaintiffs argue that they have been revived.

[10] For purposes of this discussion, the Court does not differentiate between the arguments of the various factions of Defendants, except where relevant.

_Airways, Inc._, 589 F.3d 30, 35 (1st Cir. 2009). To meet the general pleading requirements of Rule 8 of the Federal Rules of Civil Procedure, each Complaint "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" _Ashcroft v. Iqbal_, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting _Bell Atl. Corp. v. Twombly_, 550 U.S. 544, 570 (2007)). This means it must present "factual allegations that raise a right to relief above the speculative level." _Simmons v. Galvin_, 575 F.3d 24, 30 (1st Cir. 2009) (citation and internal quotation marks omitted). In judging whether this standard is satisfied, the Court may consider not only the Complaints, but "facts extractable from documentation annexed to or incorporated by reference in the [C]omplaint[s] and matters susceptible to judicial notice." _Jorge v. Rumsfeld_, 404 F.3d 556, 559 (1st Cir. 2005).

In addition, Plaintiffs' fraud claims must meet the heightened pleading requirements of Rule 9(b), which "applies to state law fraud claims asserted in federal court." _N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale_, 567 F.3d 8, 13 (1st Cir. 2009). These claims must "specify the who, what, where, and when of the allegedly false or fraudulent representation." _Alternative Sys. Concepts, Inc. v. Synopsys, Inc._, 374 F.3d 23, 29 (1st Cir. 2004). Rule 9(b) also requires "identifying the basis for inferring scienter," which refers to

11

the culpable mental state of knowingly or intentionally committing fraud. N. Am. Catholic Educ., 567 F.3d at 13.

A motion for reconsideration is properly granted where the moving party demonstrates "a manifest error of law," there exists newly discovered evidence, or a court has misunderstood a party's argument. Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 81-82 (1st Cir. 2008). Moreover, "[i]nterlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case." Perez-Ruiz v. Crespo-Guillen, 25 F.3d 40, 42 (1st Cir. 1994) (quoting Union Mut. Life Ins. Co. v. Chrysler Corp., 793 F.2d 1, 15 (1st Cir. 1986)).

**B.    Fraudulent Inducement**

In their motions for reconsideration, Defendants ask the Court to revisit the June 2 Order with respect to the viability of the fraudulent inducement claims against the Agents and the Sponsors.   Defendants argue that, even assuming that the undisclosed information (namely, that the Annuitants were terminally ill individuals with no relationship to the Owners or the Agents and the Annuitants were paid to sign the applications) was material, the Agents and the Sponsors had no duty to disclose the information in the absence of Plaintiffs' inquiry, and therefore, according to Defendants, the fraudulent inducement claims must fail.   In the June 2 Order, the Court did

not explicitly address the Agents' and the Sponsors' duty to disclose vel non, apart from the issue of materiality, but rather, the Court determined that the duty to disclose turned exclusively on materiality. See W. Reserve, 715 F. Supp. 2d at 285 ("Whether or not the duty arises -- in other words, whether a fact is material, such that it must be disclosed -- depends on the 'circumstances of [the] case.'" (quoting Home Loan & Inv. Ass'n v. Paterra, 255 A.2d 165, 168 (R.I. 1969))); see also id. at 286 n.14 ("[B]ut for fraud, the relevant duty is the duty to disclose, which turns only on the materiality of the omissions identified above."). Moreover, the Court held that an owner/applicant's duty to disclose material information may arise even where the insurer has not requested the information. Id. at 284. The Court has carefully examined and considered the parties' arguments and will use the opportunity to clarify the June 2 Order.

### 1. The Agents

To establish a claim for fraudulent inducement, under Rhode Island law, a plaintiff must demonstrate "that the defendant made a false representation intending thereby to induce plaintiff to rely thereon, and that the plaintiff justifiably relied thereon to his or her damage." Zaino v. Zaino, 818 A.2d 630, 638 (R.I. 2003) (quoting Women's Dev. Corp. v. City of Central Falls, 764 A.2d 151, 160 (R.I. 2001)) (internal

13

quotation marks omitted). Fraudulent inducement can "be grounded on either affirmative acts or concealment." Guilbeault v. R.J. Reynolds Tobacco Co., 84 F. Supp. 2d 263, 268-69 (D.R.I. 2000). But a claim of fraudulent inducement grounded on concealment, as opposed to an affirmative misrepresentation, "will not lie absent a duty to speak." Id. (citing Home Loan, 255 A.2d at 168); see also McGinn v. McGinn, 50 R.I. 236, 240 (1929) ("[M]ere silence in the absence of a duty to speak is not fraudulent and . . . even meditated silence may not be fraudulent.") (internal citations omitted). Whether a person has a duty to disclose turns on the specific circumstances of the case. Home Loan, 255 A.2d at 168. This is a flexible inquiry; one that examines the facts of each case to determine whether they give rise to a duty to disclose. See id.; see also Nisenzon v. Sadowski, 689 A.2d 1037, 1045-47 (R.I. 1997) (examining facts to determine whether there was duty to disclose). The Restatement articulates the inquiry this way: one party to a business transaction has a duty to disclose to another party, among other things,

> facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts § 551(2)(e).  As noted in the June 2 Order, the Complaints adequately plead the materiality of the undisclosed information, see W. Reserve, 715 F. Supp. 2d at 283, and thus, that information may be considered "basic to the transaction."

More difficult is the second prong of the inquiry, whether Plaintiffs could reasonably expect the Agents to disclose the pertinent information in light of their relationship with Plaintiffs and "the customs of the trade or other objective circumstances," even in the absence of any inquiry for the information on the application.  The parties make much of whether the Agents were "soliciting agents," as Plaintiffs would have it, or "independent contractors," as Defendants would have it.  But the Court need not determine the exact nature of the agency relationship between the Agents and Plaintiffs on these motions to dismiss.  It is enough that the Agents signed the annuity applications as "Registered Representative[s]/Licensed Agent[s]" and held direct or indirect contractual relationships with Plaintiffs.  Thus, even if they were independent contractors,[11] they may still arguably owe a duty to disclose

_____

[11] According to the Complaints, Condit submitted a "Producer Appointment Application" and Hanrahan submitted a "Representative Licensing Application" to Western Reserve (collectively, "Appointment Applications") "to sell certain investment products offered by Western Reserve, including the type of annuity at issue in th[ese] case[s], through [their]

15

material information when submitting an application for a financial instrument, where a reasonable representative/ independent contractor would have known that an insurer armed with the information would have rejected the application. See Burlington Ins. Co. v. Okie Dokie, Inc., 329 F. Supp. 2d 45, 49 (D.D.C. 2004) (holding that broker may be held liable to insurer where broker submits application bearing misrepresentations); Century Sur. Co. v. Crosby Ins., Inc., 21 Cal. Rptr. 3d 115, 120 (Cal. Ct. App. 2004) (holding broker liable to insurer where he submitted application with false information on it and he knew or should have known that disclosure would have resulted in rejection of application); Liberty Surplus Ins. Corp. v. First Indem. Ins. Servs., Inc., 31

---

affiliation[s] with" their brokerage companies, and Western Reserve accepted those Appointment Applications. (See 470 Compl. ¶¶ 81-82; 472 Compl. ¶¶ 87-88; 473 Compl. ¶¶ 98-99; 502 Compl. ¶¶ 78-79; 564 Compl. ¶¶ 121-22.) While the Complaints in cases 09-471 and 09-549 also allege that Maggiacomo submitted a "Producer Appointment Application" to Transamerica, Plaintiffs concede that Maggiacomo, in fact, never had a direct contractual relationship with Transamerica. In addition to the direct contractual privity that Agents Condit and Hanrahan maintained with Plaintiffs, Western Reserve had agreements with both Leaders (Condit's brokerage company) and Fortune (Hanrahan's brokerage company), stating that the Agents acted as "independent contractors, and not as agents or employees" of Western Reserve. (See Ex. 2 to Mot. to Dismiss and Request for Recons., or, in the Alternative, For a More Definite Statement ¶ 10, C.A. No. 09-470, ECF No. 96-2; Ex. C to Defs.' Mot. to Dismiss ¶ 10, C.A. No. 09-470, ECF No. 22-4.) Maggiacomo also had a relationship with Transamerica by way of the contract between Lifemark (his brokerage company) and Transamerica. (See Ex A to Pl.'s Obj. to Defs.' Mots. to Dismiss, C.A. No. 09-471, ECF No. 37-1.)

16

So. 3d 852, 857 (Fla. Dist. Ct. App. 2010) (holding insurance broker liable for negligent misrepresentation where broker submitted application on which it listed three of fourteen pending claims against applicant and failed to disclose others); St. Paul Surplus Lines Ins. Co. v. Feingold & Feingold Ins. Agency, Inc., 693 N.E.2d 669, 672 (Mass. 1998) (holding broker liable for negligent misrepresentation for submitting insurance application containing false statement).

Defendants urge that these cases involve affirmative misstatements not concealment; in each, the representative or broker-dealer, in response to an inquiry, either made a false statement, an incomplete statement, or a disclosure that was misleading when viewed in context. Defendants argue that, if no false or misleading information was provided, there is no fraud; rather the representative or broker-dealer simply out-smarted the insurers. Put another way, if an insurer does not ask the question on the application in an arms-length transaction, failure to provide the answer cannot be the basis for a fraud claim.

But as the Court noted in the June 2 Order, there are circumstances in which courts have held that an insured or applicant must disclose information, even in the absence of an inquiry by the insurer. See W. Reserve, 715 F. Supp. 2d at 284 ("[f]raudulent concealment [can make an insurance policy

voidable] even without inquiry concerning the concealed material facts by the insurer" (quoting <u>Putnam Res. v. Pateman</u>, 757 F. Supp. 157, 162 n.1 (D.R.I. 1991))); <u>Harrison State Bank v. U.S. Fid. & Guar. Co.</u>, 22 P.2d 1061, 1064 (Mont. 1933) (stating that "any concealment of a material fact known to a party, increasing the ordinary risk, would be deemed . . . fraudulent," and explaining that applicant for bank insurance knew of planned robbery that law enforcement intended to allow in an attempt to catch the criminals); <u>Sun Ins. Co. of N.Y. v. Hercules Sec. Unlimited, Inc.</u>, 195 A.D.2d 24, 30 (N.Y. App. Div. 1993) (affirming judgment on claim for fraudulent concealment where insured did not disclose that he planned to steal insured assets, where insurer had not inquired); <u>Lighton v. Madison-Onondaga Mut. Fire Ins. Co.</u>, 106 A.D.2d 892, 892-93 (N.Y. App. Div. 1984) (allowing claim for fraudulent concealment based on omission of fact that fires had occurred in plaintiffs' basement several months before applying for insurance, even though plaintiffs were not asked about prior fires). Although these cases involve nondisclosure by insureds and applicants for insurance, there is no reason why the same rule should not hold true for independent contractors of the insurer, who are in contractual relationships with the insurer, are knowledgeable of the material, undisclosed facts, and submit an application on behalf of an applicant. Here, the Complaints charge the Agents

with knowledge of the STAT scheme, including knowledge that the Annuitants were paid for their participation, and in some cases, that the Annuitants' signatures were forged or procured by fraud. These facts, as alleged, are sufficient to establish objective circumstances that give rise to a duty to disclose.

Accordingly, Defendants' motions to dismiss and for reconsideration are denied with respect to the fraudulent inducement claims against the Agents.[12]

---

[12] In addition to pleading fraudulent inducement based on concealment, some of the Complaints also succeed in setting forth a claim for fraudulent inducement based on the affirmations appearing on the annuity applications. Each application contains the following affirmation, under which the respective Agent placed his signature:

> I HAVE MADE REASONABLE EFFORTS TO OBTAIN INFORMATION CONCERNING THE CONSUMER'S FINANCIAL STATUS, TAX STATUS, INVESTMENT OBJECTIVES AND SUCH OTHER INFORMATION USED OR CONSIDERED TO BE REASONABLE IN MAKING THE ANNUITY RECOMMENDATION AND FIND THE ANNUITY BEING APPLIED FOR APPROPRIATE FOR HIS/HER NEEDS.

(E.g., Ex. G to Compl. 8, C.A. No. 09-549, ECF No. 1-7; Ex. C to Compl. 10, C.A. No. 09-502, ECF No. 1-4.) The Complaints in cases 09-471, 09-472, 09-502, 09-549, and 09-564, each adequately plead a cause of action against the respective agent for fraudulent inducement based on these attestations and the allegations that the Agents either failed to have any substantive involvement in selling the annuities or that they failed to review or verify any of the information on the applications. (See 471 Compl. ¶ 45; 472 Compl. ¶ 43; 502 Compl. ¶ 44; 549 Compl. ¶¶ 31-32, 41, 47, 63; 564 Compl. ¶ 32.)
Because similar allegations were not made against the Agents in cases 09-470 and 09-473, Plaintiffs fail to make out a claim of fraudulent inducement grounded in affirmative statements against the Agents in those cases. However, regardless of these inadequacies, all counts of fraudulent inducement against the Agents survive because Plaintiffs have

## 2. The Sponsors

With respect to the Sponsors' duty to disclose, the thrust of Defendants' argument is that the Sponsors cannot be held liable for fraudulent nondisclosure because, in the absence of any relationship, dealings, or communications with Plaintiffs, they had no duty to disclose information to them. For their part, Plaintiffs rest the duty to disclose squarely on the Sponsors' "active role in the conspiracy to defraud Plaintiff[s]," as alleged in the Complaints. (Omnibus Obj. to Defs.' Mots. to Dismiss and for Recon. 24, C.A. No. 09-470, ECF No. 67.)

While it may be possible for circumstances to give rise to a duty to disclose where parties do not have an underlying contractual or business relationship, the circumstances pleaded

---

pleaded a cause of action for fraudulent concealment, as discussed above.

The Court retracts the language in the June 2 Order suggesting that the affirmations state that the Agents sold the annuities. See W. Reserve, 715 F. Supp. 2d at 285. While this is alleged in some of the Complaints, the applications themselves reflect that the Agents made no express representation to that effect. On a motion to dismiss, the Court may consider documents beyond, but integral to, the Complaint. Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008); see also Diva's Inc. v. City of Bangor, 411 F.3d 30, 38 (1st Cir. 2005). And where the allegations set forth in the Complaint are inconsistent with a writing attached as an exhibit, "the terms of the latter, fairly construed, must prevail over any averments differing therefrom." 5 Charles Alan Wright and Arthur R. Miller, Federal Practice & Procedure § 1235 (citing Ott v. Home Savs. & Loan Ass'n, 265 F.2d 643, 646 (9th Cir. 1958)).

in these cases as to the Sponsors -- where the Sponsors and Plaintiffs had no contractual relationship, no communications, no business dealings, and no direct dealings -- do not give rise to such a duty. See Moore v. Fenex, Inc., 809 F.2d 297, 303 n.2 (6th Cir. 1987) (stating that fraudulent nondisclosure "applies between parties to a business transaction. We are aware of no case, nor has any been cited, where a party has been held liable for fraudulent nondisclosure that had no direct dealings with the plaintiff"); see also Magna Bank of Madison County v. Jameson, 604 N.E. 2d 541, 544 (Ill. App. Ct. 1992) ("There is no duty to speak absent a fiduciary or other legal relationship between the parties."); cf. Chiarella v. United States, 445 U.S. 222, 227-28 (1980) ("At common law, . . . one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.") (alteration in original) (internal quotation marks and citation omitted); Cardiovascular & Thoracic Assoc., Inc. v. Fingleton, C.A. No. 95-1322, 1995 WL 941470, at *3 (R.I. Super. Ct. Aug. 23, 1995) ("[F]raud can be established by silence where the business relationship of the parties is such

as to create a duty to disclose certain facts." (citing <u>Kennett-Murray Corp v. Bone</u>, 622 F.2d 887, 892 n.4 (5th Cir. 1980))).

Plaintiffs are correct that the Sponsors' orchestration of the fraudulent scheme may support a claim for civil conspiracy. However, in order to state a claim for fraudulent concealment against the Sponsors, Plaintiffs must plead each element of the tort, including a duty to disclose; pleading conspiracy is not a substitute for this requirement. <u>See</u> <u>Beck v. Prupis</u>, 529 U.S. 494, 502 (2000) ("[The plaintiff] must allege all the elements of a cause of action for the tort the same as would be required if there were no allegation of a conspiracy." (quoting <u>J. & C. Ornamental Iron Co. v. Watkins</u>, 152 S.E.2d 613, 615 (Ga. 1966))). Accordingly, the fraudulent inducement counts are dismissed with respect to the Sponsors.[13]

---

[13] Though the fraudulent inducement counts against the Sponsors do not go forward in the absence of a duty to disclose, this result may have no practical effect in most of the instant cases. As discussed below, the civil conspiracy counts against the Sponsors survive these motions, and if proven, the Sponsors may be held jointly liable for the Agents' fraud. <u>See</u> <u>Guilbeault v. R.J. Reynolds Tobacco Co.</u>, 84 F. Supp. 2d 263, 268 (D.R.I. 2000) (noting that civil conspiracy imposes joint liability on co-conspirators). Case 09-470, however, does not allege civil conspiracy against any Defendants.

### 3. Waiver

Relying on a decision out of this Court decided shortly after the Court's June 2 Order, <u>Nationwide Life Ins. Co. v. Steiner</u>, 722 F. Supp. 2d 179 (D.R.I. 2010), Defendants argue that Plaintiffs, by failing to ask questions designed to elicit the information at issue, have waived their opportunity to complain of nondisclosure.

In <u>Steiner</u>, the insurer, on its annuity application, inquired as to the relationship between the beneficiary and the annuitant. <u>Id.</u> at 180. The applicants left the question blank, but the company accepted the application and premium and issued the annuity, never following up on the blank answer. <u>Id.</u> Thereafter, the annuitant died and the applicants sought payment under the annuity. <u>Id.</u> The company learned that the annuitant had been terminally ill when the application was submitted, and with this knowledge in hand, it tried to back out of the contract. <u>Id.</u> at 181. On those facts, the Court held that Nationwide "waived the right to rely on the blank application question as a basis" to terminate the annuity contract under the applicable contractual termination provision, because in Rhode Island, "an insurer waives the right to deny coverage by accepting a premium payment 'with full knowledge' of grounds for not fulfilling its obligations under the policy." <u>Id.</u> at 185 (quoting <u>Imperial Cas. & Indem. Co. v. Bellini</u>, 888 A.2d 957,

23

963-64 (R.I. 2005)). The Court further noted that the First Circuit has recognized that "an insurer may lose its right to rescind the coverage of an insurance contract if it knows of the facts that may warrant rescission and fails to disclaim within a reasonable time, or if it acts in any way inconsistent with an intention to disclaim." Id. (quoting Gen. Star Indem. Co. v. Duffy, 191 F.3d 55, 59 (1st Cir. 1999)).

The instant cases, however, are distinguishable from Steiner. Plaintiffs here did not pose any questions on the applications directed to elicit the information they now contend should have been disclosed; therefore, they did not accept incomplete applications. The answer left blank on the application was critical to the Court's reasoning in Steiner, because it placed the insurer on notice of omitted information, thereby giving the insurer the opportunity to follow up. Here, there were unanswered questions on the applications, and so, there was no signal to Plaintiffs to investigate. Accordingly, Defendants get no traction with their waiver argument.

Apart from what has been reconsidered and clarified above, the Court reaffirms the June 2 Order with respect to the fraudulent inducement claims.

### C. Fraud in the Factum and Related Counts

Plaintiffs have pleaded claims of fraud in the factum in cases 09-470, 09-471, 09-473, 09-549, and 09-564, against the

Sponsors, Brokers, and Agents in each case, and the Owner, DK, in 09-473. In cases 09-470, 09-549, and 09-564, the Complaints allege that "[a]ll Defendants committed fraud in the factum by either forging [the Annuitant's] signature to the annuity application and submitting it to [Plaintiffs], or by concealing the existence, nature and essential terms of the annuity from [the Annuitant] in order to get him to sign the application under which he purportedly agreed to serve as an annuitant." (470 Compl. ¶ 41; <u>accord</u> 549 Compl. ¶ 130; 564 Compl. ¶ 85.) In cases 09-471 and 09-473, the Complaints do not allege forgery, but only that Defendants committed fraud in the factum by "concealing the existence, nature and essential terms of the annuity from [the Annuitant]." (471 Compl. ¶ 50; 473 Compl. ¶ 51.) The Complaints allege that Defendants thereafter submitted the applications to Plaintiffs, giving Plaintiffs "the false or misleading impression that [the Annuitant] knowingly and voluntarily signed the application." (<u>E.g.</u>, 470 Compl. ¶ 43.) Because of this, Plaintiffs claim they "entered the annuity contract without knowledge of the true nature or character of the terms of the agreement" and without a reasonable opportunity to discover its true nature. (<u>See, e.g.</u>, 470 Compl. ¶¶ 44-45.) Defendants move to dismiss all of the fraud in the factum counts against the Sponsors, the Agents, DK, and Fortune.

Under Rhode Island law, fraud in the factum "concerns '[m]isrepresentation as to the nature of a writing that a person signs with neither knowledge nor reasonable opportunity to obtain knowledge of its character or essential terms." Rhode Island Depositors Econ. Prot. Corp. v. Duguay, 715 A.2d 1278, 1280 (R.I. 1998) (quoting Black's Law Dictionary 661 (6th ed. 1990)); see also Bennion Ins. Co. v. 1st OK Corp., 571 P.2d 1339, 1341 (Utah 1977) ("[F]raud in factum is found only where forgery is proved, or where the fraud is tantamount to forgery, such as where an incompetent person is induced to sign a deed, or where the deed is surreptitiously substituted for another instrument the grantor believes he is signing . . . ."). In contrast to fraud in the factum, fraudulent inducement is a "[m]isrepresentation as to the terms, quality or other aspects of a contractual relation . . . that leads a person to agree to enter into the transaction with a false impression or understanding of the risks, duties or obligations she has undertaken." Duguay, 715 A.2d at 1280 (quoting Bourdon's, Inc. v. Ecin Indus., Inc., 704 A.2d 747, 753 (R.I. 1997)).

All of Plaintiffs' fraud in the factum claims fail because, in actuality, they are nothing more than fraudulent inducement claims dressed up as fraud in the factum allegations. The crux of Plaintiffs' claims is that the Defendants, either by forging signatures on the applications or concealing the nature of the

applications from the Annuitants, fraudulently induced Plaintiffs into issuing the annuity contracts. Essentially, Plaintiffs say they were tricked into agreeing to the annuity contracts, but not that they believed they were entering into contracts of a different nature or that they did not have an opportunity to learn the essential terms of the contracts. See Duguay, 715 A.2d at 1280 (stating that to establish fraud in the factum, a party must demonstrate that he had "neither knowledge nor reasonable opportunity to obtain knowledge of its character or essential terms") (internal quotation marks and citation omitted). Indeed, it is a bit ironic for Plaintiffs to suggest that they did not know the true nature of contracts that they themselves drafted. The fact is, Plaintiffs intended to sell variable life annuities, they believed they sold variable life annuities, and they did, in fact, sell variable life annuities. Therefore, they cannot seriously argue that they have misapprehended the nature of their own contracts.

Plaintiffs' claims of fraud in the factum on behalf of the Annuitants with respect to the annuity applications likewise fail. The doctrine of fraud in the factum renders a contract void ab initio only where a contracting party does not understand the nature of the contract. Here, the Annuitants were not parties to any contract; they were not bound in any way by the annuity applications, let alone the annuity contracts.

(See, e.g., Ex. B-1 to Compl., C.A. No. 09-470, ECF No. 1-4; Ex. D-1 to Compl., C.A. No. 09-502, ECF No. 1-5 (stating that, the annuity contract "is a legal contract between the policyowner and the Company [Plaintiffs]").) Plaintiffs cannot evade their contractual obligations under the annuity contracts by alleging forgery or concealment of essential terms with respect to the Annuitants vis-à-vis the annuity applications.

Plaintiffs' forgery allegations also run afoul of Rule 9(b). While state law governs the elements necessary to establish a fraud claim, "the procedure for pleading fraud in federal court in a diversity suit is governed by the requirements of Rule 9(b)." Guilbeault, 84 F. Supp. 2d at 268-69. Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). In this Circuit, a plaintiff is required to specify in his pleadings "the time, place, and content of the alleged false or fraudulent representations." Powers v. Boston Cooper Corp., 926 F.2d 109, 111 (1st Cir. 1991). Moreover, it is well established that "[w]here multiple defendants are involved, each person's role in the alleged fraud must be particularized in order to satisfy Rule 9(b)." Loan v. Fed. Deposit Ins. Corp., 717 F. Supp. 964, 968 (D. Mass. 1989) (citing Margaret Hall Found. v. Atl. Fin. Mgmt., Inc., 572 F. Supp. 1475, 1481 (D. Mass. 1983)); accord

DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987); In re Compact Disc Minimum Advertised Price Antitrust Litigation, 456 F. Supp. 2d 131, 151 n.27 (D. Me. 2006); In re Maroun, 427 B.R. 200, 206 (Bankr. D.N.H. 2010). Therefore, to adequately plead fraud in the factum grounded in forgery, Plaintiffs may not allege wholesale (or "group") forgery by Defendants without more particularized allegations of each Defendant's role, including which one of the Defendants put pen to paper and executed the forgeries.

Accordingly, the fraud in the factum counts in each of the cases in which it is alleged (cases 09-470, 09-471, 09-473, 09-549, and 09-564), against the Agents, the Sponsors, DK, and Fortune are dismissed.[14]  Insofar as Plaintiffs have attempted to revive their counts for rescission and declaratory judgment in case 09-471 on the basis that the annuities were void ab initio due to fraud in the factum, those counts also are dismissed.[15]

---

[14] In addition to the infirmities addressed here, Defendants advance other arguments for dismissal of the fraud in the factum counts.  While the Court does not reach those arguments, they may also be fatal to Plaintiffs' claims.

[15] Plaintiffs also included fraud in the factum as a basis for rescinding the annuity contract or declaring it void in case 09-473.  However, DK and Plaintiffs have agreed that the annuity is rescinded and so, those counts are moot.  (See Omnibus Obj. to Defs.' Mots. to Dismiss and for Recon. 9, C.A. No. 09-470, ECF No. 67.)

## D. Breach of Contract against the Agents

Agents Condit and Hanrahan move to dismiss the breach of contract claims against them in cases 09-470, 09-472, 09-473, 09-502, and 09-564.[16] The Complaints allege that Western Reserve accepted Condit's and Hanrahan's Appointment Applications. The Appointment Applications, which are appended to the Agents' filings, reflect that Condit and Hanrahan signed a declaration stating:

> I shall comply with the rules and regulations of the Company as they may be established from time to time, and the laws of the states in which I am licensed and the regulations of the Department of Insurance of each such state, including, but not limited to, keeping in force all licenses and permits for the solicitation of insurance.

(Ex. B to Consolidated Mot. to Dismiss the Newly Am. Compls. and Req. for Recons. 2, C.A. No. 09-470, ECF No. 94-3; Ex. 1 to Mot. to Dismiss and Req. for Recons. Or, in the Alternative, For a More Definite Statement 2, C.A. No. 09-470, ECF No. 96-1.) They further affirmed that they "shall comply with the concepts in the Company's Code of Professional Conduct . . . ." (Id.)

The Complaints also allege the following: on the Appointment Applications, Condit and Hanrahan "agreed that if Western Reserve consented to the appointment, then [they] would

---

[16] Plaintiffs do not assert breach of contract claims against Maggiacomo, who is the Agent named in the other two Complaints, presumably because he is not alleged to have had a direct contractual relationship with Transamerica.

comply with Western Reserve's rules and regulations, applicable state laws and the Ethics Code identified herein." (<u>E.g.</u>, 470 Compl. ¶ 81; 472 Compl. ¶ 87.) Condit's and Hanrahan's participation in the STAT scheme "was contrary to [their] obligation under the Ethics Code to conduct [themselves] 'according to the high standards of honesty and fairness,' to use 'appropriate fact finding tools' to assist customers [in] determin[ing] their '<u>insurable</u> needs and financial objectives,' and to sell products that meet customers' 'insurable needs or financial objectives' and constituted a breach of [their] contractual obligations owed to Western Reserve." (<u>E.g.</u>, 470 Compl. ¶ 83; 472 Compl. ¶ 89 (emphasis in original)). Moreover, the Complaints allege that their participation was "contrary to state law and Western Reserve's rules and regulations," and therefore, constituted a breach of their contractual obligations. (<u>E.g.</u>, 470 Compl. ¶ 84; 472 Compl. ¶ 90.)

In sum, Plaintiffs allege that the Agents breached their contracts with Western Reserve by (1) violating the Ethics Code; (2) failing to comply with Western Reserve's rules and regulations; and (3) violating state law. The Court concludes that, in cases 09-470 and 09-564, Plaintiffs plead a cognizable breach of contract claim based on the alleged state law violations.

In cases 09-470 and 09-564, the forgery allegations are sufficient to serve as the underpinning for a breach of contract claim grounded in the violation of state law. Although the wholesale forgery allegations were not sufficiently particularized to plead a cause of action for fraud in the factum, the relaxed pleading standard of Rule 8 governs breach of contract claims, see 5 Charles Alan Wright and Arthur R. Miller, Federal Practice & Procedure § 1235 (3d ed. 2011), and Plaintiffs' allegations satisfy this standard.[17]   Taking the allegations in the Complaints as true, it is plausible that

---

[17] For purposes of this claim, the Court also disregards all allegations in the Complaint inconsistent with forgery. Plaintiffs were free to plead alternative factual predicates (viz., forging the Annuitants' signatures and misleading the Annuitants to procure their signatures) to support their claims. See BMC-The Benchmark Mgmt. Co. v. Ceebraid-Signal Corp., No. 1:05-cv-1149-WSD, 2007 WL 4200198, at *6 (N.D. Ga. Nov. 23, 2007) (noting that generally, a plaintiff "is not always required to elect a single theory of the factual situation where fraud is claimed, and, at least, where each of two alternative statements independently satisfies the particularity requirement of Rule 9(b), the pleading does not violate that rule solely because the alternatives are stated" (quoting Hirshfield v. Briskin, 447 F.2d 694, 697 (7th Cir. 1971))), aff'd BMC-The Benchmark Mgmt. Co. v. Ceebraid-Signal Corp., 292 Fed. App'x 784 (11th Cir. 2008); Holveck v. Ameriquest Mortg. Co., No. 02 C 1154, 2003 WL 21149085, at *2 (N.D. Ill. May 19, 2003) (denying a motion to dismiss where the complaint pleaded "incomplete, alternative factual scenarios"). But see Vladimir v. Deloitte & Touche LLP, No. 95 CIV 10319 (RPP), 1997 WL 151330, at *7 (S.D.N.Y. Mar. 31, 1997) (holding that "[a]lternative fact pleading is insufficient to satisfy the requirements of Fed. R. Civ. P. 9(b)" where "plaintiffs' counsel [had] been in possession of defendant's work papers for three years and [had] conducted extensive discovery").

Agent Condit forged the signatures on the annuity applications in cases 09-470 and 09-564, thereby violating the state law criminalizing forgery.[18]

With respect to the allegations concerning violations of Western Reserve's rules and regulations, Plaintiffs point to a document entitled "Insurance Compliance Bulletin," which appears to originate from its Florida office and states that Western Reserve "will not accept annuity applications where the contract owner/applicant does not have an appropriate insurable interest in the life of the annuitant." (Ex. D to Omnibus Obj., C.A. No. 09-470, ECF No. 67-4.) On closer inspection, this flyer places the onus on Western Reserve to scrutinize incoming applications for potential deficiencies related to insurable interests and to reject non-complying applications. (See id.) Nowhere does the bulletin state that agents may not submit such applications; and, while this may be a reasonable implication of the document, the bulletin does not specifically direct agents to refrain from submitting such applications. Therefore, even if the Court, viewing the facts pleaded in the light most favorable to Plaintiffs, assumes that the instant Agents received this flyer

---

[18] Of course, it is doubtful that a contract can be read to impose upon the Agents a contractual obligation to comply with all state laws, regardless of how unrelated they may be to the contract; rather, the sensible reading of this language is that it is intended to require agents to comply with those state laws governing insurance brokers or otherwise related to selling financial instruments, such as the prohibition on forgery.

and that the flyer is a "rule or regulation," the allegations set forth in the Complaints do not state a breach of contract claim based on the Agents' failure to comply with Western Reserve's rules and regulations.

As for the alleged breach grounded in the Agents' violation of the Ethics Code, while the Agents' contractual duties arise from their signed applications, the Ethics Code referenced therein consists only of aspirational and precatory language about how agents should act in relation to their customers.

Under Iowa law,[19] contract interpretation and construction are questions of law to be decided by the Court. <u>Pillsbury Co. v. Wells Dairy, Inc.</u>, 752 N.W.2d 430, 435-36 (Iowa 2008). Looking to the Ethics Code, there can be no question that it dictates how Western Reserve would like its agents to treat its customers. For example, the second paragraph states, in part, "Together, let us strive to always put the interests of the customer first. This Code formally states in one place many of the values to which we have been committed throughout our

---

[19] Plaintiffs contend that Iowa law controls the Appointment Applications because they were submitted to and accepted by Western Reserve in Iowa. <u>See</u> <u>DeCesare v. Lincoln Benefit Life Co.</u>, 852 A.2d 474, 484 (R.I. 2004) (noting that under Rhode Island's conflict of laws doctrine, in the absence of a controlling contractual provision, the law of the state where the contract was executed governs). While these facts are not alleged in the Complaints and Plaintiffs do not attach any supporting documentation, Defendants do not provide any conflicting evidence, and so the Court assumes Iowa law controls the Appointment Applications for purposes of this decision.

history.  We ask you, as the true professional you are, to commit yourself to these ethical concepts."  (Ex. C to Defs.' Mot to Dismiss 1, C.A. No. 09-470, ECF No. 94-4.)  While Plaintiffs ask the Court to focus not on the actual words of the Ethics Code, but rather to look to the broader "concepts" behind it, the Court concludes that the language set forth in the Ethics Code is clearly precatory and not intended to be binding on the Agents, see Mattes v. ABC Plastics, Inc., 323 F.3d 695, 699 (8th Cir. 2003) (stating that precatory language "gives rise to no specific contractual duty"), and therefore, Plaintiffs have not pleaded a claim for breach of contract in this respect.

Accordingly, cases 09-470 and 09-564, plead a viable claim for breach of contract against Agent Condit based upon his alleged violations of state law, and his motion to dismiss is denied with respect to these counts.  Because Plaintiffs do not plead forgery in cases 09-472, 09-473, and 09-502, in which Hanrahan is the named agent, and Plaintiffs fail to state a viable breach of contract claim predicated on other grounds, Hanrahan's motion to dismiss is granted as to the breach of contract counts against him.[20]

---

[20] In light of the Court's conclusion, Defendant Hanrahan's request for a more definite statement is denied as moot.

**E.    Breach of the Duty of Good Faith and Fair Dealing**

Defendants Condit and Hanrahan ask the Court to dismiss the counts against them alleging breach of the duty of good faith and fair dealing because, they contend, Plaintiffs have failed to allege the breach of an express contractual provision.

Under Iowa law, the duty of good faith and fair dealing "does not give rise to new substantive terms that do not otherwise exist in the contract," Mattes, 323 F.3d at 700, but rather "the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." Mid-America Real Estate Co. v. Iowa Realty Co., 406 F.3d 969, 974 (8th Cir. 2005) (quoting Carma Developers, Inc. v. Marathon Dev. Cal., Inc., 826 P.2d 710, 727 (Cal. 1992)). The "covenant is breached when a party to a contract acts in a manner that is offensive to 'community standards of decency, fairness and reasonableness.'" Kopple v. Schick Farms, Ltd., 447 F. Supp. 2d 965, 982 (N.D. Iowa 2006) (quoting Kooyman v. Farm Bureau Mut. Ins. Co., 315 N.W.2d 30, 34 (Iowa 1982)). Because Plaintiffs have adequately pleaded breach of contract based on the express terms of the agreement between Condit and Plaintiffs, so too, Plaintiffs' claim for breach of the duty of good faith and fair dealing against Condit survives his motion

to dismiss.[21]  Agent Hanrahan's motion to dismiss with respect to this count, in cases 09-472, 09-473, and 09-502, is granted because, as stated above, Plaintiffs do not plead a viable breach of contract claim against him and "the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract." Mid-America, 406 F.3d at 974 (quoting Carma Developers, 826 P.2d at 727).

## F.  Civil Conspiracy

To adequately plead civil conspiracy, a plaintiff must allege that "(1) there was an agreement between two or more parties and (2) the purpose of the agreement was to accomplish an unlawful objective or to accomplish a lawful objective by unlawful means."  Smith v. O'Connell, 997 F. Supp. 226, 241 (D.R.I. 1998) (quoting Stubbs v. Taft, 149 A.2d 706, 708-09 (R.I. 1959)).  "Civil conspiracy is not an independent basis of liability, but merely a means of establishing joint liability for tortious conduct.  Thus, a civil conspiracy claim requires a valid underlying intentional tort theory."  Guilbeault, 84 F.

---

[21]  Defendants also argue that Plaintiffs' claims fail because the Iowa Supreme Court does not recognize a cause of action for a breach of the duty of good faith and fair dealing "in employment situations."  See NCMIC Fin. Corp. v. Artino, 638 F. Supp. 2d 1042, 1074 (S.D. Iowa 2009) (quoting Nelson v. Long Lines Ltd., 335 F. Supp. 2d 944, 968 (N.D. Iowa 2004)). However, while it is clear that Iowa law does not recognize the cause of action in employment termination situations, see Fogel v. Trs. of Iowa Coll., 446 N.W.2d 451, 456-57 (Iowa 1989), there is no reason to believe that it would not be recognized under these circumstances.

Supp. 2d at 268 (citing ERI Max Entm't, Inc. v. Streisand, 690 A.2d 1351, 1354 (R.I. 1997)). Here, Plaintiffs have pleaded a valid theory of fraudulent inducement against the Agents, and accordingly, their civil conspiracy counts survive.

### G. Civil Liability for Forgery

Defendants seek dismissal of the new claims for civil liability for crimes and offenses, pursuant to R.I. Gen. Laws § 9-1-2,[22] based on forgery of the annuity applications, which are alleged in cases 09-470 (against the Agent and Broker), 09-549 (against the Sponsors, Agent, and Broker), and 09-564 (against the Sponsors, Agent, and Broker). (See 470 Compl. ¶¶ 66-72; 549 Compl. ¶¶ 151-57; 564 Compl. ¶¶ 103-09.)

In the June 2 Order, the Court dismissed the counts of civil liability for crimes and offenses grounded in the Rhode Island insurance fraud statute, R.I. Gen. Laws § 11-41-29, because that statute criminalizes deceit in connection with insurance policy applications, not applications for the issuance of annuities, such as the ones involved here. W. Reserve, 715 F. Supp. 2d at 287. In their amendments, Plaintiffs attempt to

---

[22] R.I. Gen. Laws § 9-1-2 provides in pertinent part:

Whenever any person shall suffer any injury to his or her person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for the injury in a civil action against the offender, and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made . . . .

revive this cause of action by alleging civil liability for forgery.

R.I. Gen. Laws § 11-17-1 makes it a crime to

> falsely make, alter, forge, or counterfeit, or procure to be falsely made, altered, forged, or counterfeited . . . policy of insurance, . . . or any writing whatsoever purporting to contain evidence of any debt, contract, or promise, or of the discharge, payment of satisfaction of any debt, contract, or promise, with intent to defraud.

Defendants say that because annuity contracts are not enumerated within the statute, Rhode Island does not criminalize the forging of annuity applications. However, the catchall phrase "any writing whatsoever purporting to contain evidence of any debt, contract, or promise" arguably encompasses these annuity applications, which contain evidence of a promise.

Moreover, the relaxed pleading standard of Rule 8 governs the pleading of this count, and therefore, as noted previously, Plaintiffs are free to allege in the alternative, and factual allegations inconsistent with the crime of forgery are disregarded for purposes of considering this count on a motion to dismiss. See Fed. R. Civ. P. 8(d)(2)&(3). Similarly, the wholesale forgery allegations implicating "all Defendants" are not fatal to this count.

Accordingly, the counts alleging civil liability for crimes and offenses in cases 09-470, 09-549, and 09-564 survive Defendants' motions to dismiss.

## H. Unjust Enrichment

Defendants argue that Plaintiffs' unjust enrichment claims should be dismissed because they are derivative of the fraud claims which they seek to have dismissed. To make out a claim for unjust enrichment, under Rhode Island law, a plaintiff must prove that (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant appreciated the benefit; and (3) it would be inequitable, under the circumstances, for the defendant to retain the benefit without paying for its value. Narragansett Elec. Co. v. Carbone, 898 A.2d 87, 99 (R.I. 2006). In contrast to a claim for civil conspiracy, a claim for unjust enrichment does not require the existence of an underlying tort, and so, strictly speaking, Plaintiffs' unjust enrichment claims are not derivative of their fraud claims. Defendants present no other arguments on this point, and accordingly, the unjust enrichment claims survive their motions.

## I. Negligence Claims Against Agent Maggiacomo

In their briefing, Plaintiffs stated that they "do[] not seek to resurrect negligence counts against any of the defendants at this time." (Omnibus Obj. 32, C.A. No. 09-470, ECF No. 67.) After the hearing on the instant motions, counsel for Plaintiffs wrote a letter informing the Court that Plaintiffs now take the position that "the Economic Loss Doctrine does not bar the pending negligence count against

Defendant/Agent Edward Maggiacomo. He is not alleged to have been in a direct contractual relationship with Plaintiff Transamerica. It is therefore Transamerica's position that the most recent pleadings raise valid and pending negligence counts against Defendant Maggiacomo." (Letter from Brooks R. Magratten to Hon. William E. Smith (Aug. 9, 2011).)

First, the Court considers Plaintiffs' argument waived. Their argument was submitted by letter to the Court (not by the Electronic Case Filing (ECF) system) after briefing and argument on the pending motions had closed. Second, the argument lacks merit. The reasoning in the June 2 Order with respect to the dismissal of the negligence claims against the Agents and the Brokers turned on the contracts between Plaintiffs and the Brokers; therefore, the confirmed absence of a direct contractual relationship between Maggiacomo and Transamerica does not alter the Court's prior economic loss doctrine analysis. See W. Reserve, 715 F. Supp. 2d at 289-90. Accordingly, in cases 09-471 and 09-549, the Court reaffirms its dismissal of the derivative negligence counts against Maggiacomo and dismisses the negligence claims against Estate Planning Resources based on vicarious liability for Maggiacomo's actions.

## III. Conclusion

Defendants Caramadre, Radhakrishnan, Rodrigues, Condit, EPR, and ADM's motion to dismiss and for reconsideration, filed

in cases 09-470, 09-471, 09-472, 09-473, 09-502, 09-549, and 09-564 is hereby GRANTED in part and DENIED in part; Defendants Hanrahan's and Maggiacomo's motions to dismiss and for reconsideration are hereby GRANTED in part and DENIED in part; DK's motion to dismiss, filed in case 09-473, is hereby GRANTED; and Fortune's motion to dismiss, filed in cases 09-470 and 09-564, is hereby GRANTED in part and DENIED in part.

The fraudulent inducement counts against Defendants Caramadre, Radhakrishnan, and EPR in all above-captioned cases are hereby DISMISSED. The fraudulent inducement counts against Defendants Condit, Hanrahan, and Maggiacomo will proceed. The fraud in the factum counts (pleaded in cases 09-470, 09-471, 09-473, 09-549, and 09-564) against Defendants Caramadre, Radhakrishnan, EPR, Condit, Hanrahan, Maggiacomo, DK, and Fortune are hereby DISMISSED. Likewise, the rescission and declaratory judgment counts in case 09-471, insofar as they are based on allegations of fraud in the factum, are DISMISSED. The counts alleging breach of contract and breach of the duty of good faith and fair dealing against Defendant Hanrahan, in cases 09-472, 09-473, and 09-502, are hereby DISMISSED. The counts alleging breach of contract and breach of the duty of good faith and fair dealing against Defendant Condit, in cases 09-470 and 09-564, will go forward. The counts alleging civil conspiracy (all cases except 09-470), unjust enrichment (all cases), civil

liability for crimes and offenses grounded in forgery (in cases 09-470, 09-549, and 09-564) will proceed, except those counts dismissed as to certain Defendants in the June 2 Order. The negligence claims against Defendants Maggiacomo and EPR in cases 09-471 and 09-549 are hereby DISMISSED.

By stipulation, Leaders and Plaintiffs have also agreed that Leaders' motion for partial dismissal of the Second Amended Complaint (Counts VII and XI) in case 09-473 may be denied as moot because Plaintiffs are not pursuing those counts against Leaders. (See Dismissal Stipulation, C.A. No. 09-473, ECF No. 71.) Therefore, that motion is denied as moot. In addition, DK and Plaintiffs agree that DK's earlier motion for judgment on the pleadings (see Mot. of DK, LLC for J. on the Pleadings, C.A. No. 09-473, ECF No. 61) is moot based on the third round of pleadings. Accordingly, DK's motion for judgment on the pleadings is also denied as moot.

The Court further reaffirms the dismissal of all claims previously dismissed but not discussed in the instant Opinion and Order.

IT IS SO ORDERED.


/s/ William E. Smith
William E. Smith
United States District Judge
Date: February 7, 2012