UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                )
TRANSAMERICA LIFE INSURANCE     )
COMPANY and WESTERN RESERVE     )
LIFE ASSURANCE CO. OF OHIO,     )
                                )
          Plaintiffs,           )
                                )
     v.                         )    C.A. No. 09-470 S
                                )
JOSEPH CARAMADRE; RAYMOUR       )
RADHAKRISHNAN; ESTATE PLANNING  )
RESOURCES, INC.; ADM ASSOCIATES,)
LLC; HARRISON CONDIT; EDWARD    )
MAGGIACOMO, JR.; and FORTUNE    )
FINANCIAL SERVICES, INC.,       )
                                )
          Defendants.           )
_____)
```

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, Chief Judge.

As discussed in the Court's February 27, 2017 Memorandum and Order (ECF No. 231), Plaintiffs are moving for Prejudgment Attachment of Caramadre's Membership Interest in ADM Associates, LLC ("ADM") and for a Preliminary Injunction Preventing Caramadre from Transferring Assets of ADM or his Interest therein ("Motion") (ECF No. 187). The Motion was referred to Magistrate Judge Patricia A. Sullivan, who received additional briefing, held a hearing, and issued a Report and Recommendation ("R&R") on July 27, 2017, recommending that Plaintiffs' Motion be granted (ECF No. 245). With respect to the part of the Motion seeking an order for prejudgment attachment, the Magistrate Judge concluded that,

pursuant to Rhode Island General Laws § 10-5-6, Caramadre's membership interest in ADM could be attached because he is currently not a resident of Rhode Island and Plaintiffs have prevailed on their tort claims against him. The Magistrate Judge also concluded that, pursuant to Rhode Island General Laws § 10-5-5, his membership interest in ADM could be attached because Plaintiffs' pending claim for unjust enrichment is an equitable claim. With respect to the part of the Motion seeking a preliminary injunction, the Magistrate Judge concluded that the circumstances of this case warrant barring Caramadre from transferring or dissipating the Buckman annuity, which is undisputedly ADM's sole asset.

Caramadre and ADM ("Defendants") filed an objection to the R&R, arguing that the Magistrate Judge erred by deeming Caramadre a nonresident of Rhode Island and concluding that Plaintiffs had shown the irreparable harm factor of the preliminary injunction analysis. The Court reviews de novo the parts of the R&R to which an objection is made. 28 U.S.C. § 636(b)(1).

After considering Plaintiffs' Motion, Defendants' objection, the R&R, and Defendants' objection thereto, the Court agrees with the Magistrate Judge's analysis and adopts her reasoning in its entirety. Defendants' objection to the finding that Caramadre is a non-resident of Rhode Island is based on his argument that Caramadre remains a resident of Rhode Island even though he has

been incarcerated in a different state throughout the pendency of the litigation.  In the case that Defendants cite for support, the First Circuit examined the citizenship and domiciliary status of an inmate to assess diversity jurisdiction, but does not discuss residency status at all. See Hall v. Curran, 599 F.3d 70, 72 (1st Cir. 2010).  Section 10-5-6 is explicitly based on residency, which is distinct from domicile. See Miss. Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 48 (1990).  Moreover, Defendants do not object to the Magistrate Judge's conclusion that prejudgment attachment is warranted pursuant to § 10-5-5 based on Plaintiffs' equitable claim for unjust enrichment.  Regardless of Caramadre's state of residence, the writ of attachment may issue based on Plaintiffs' unjust enrichment claim.

Turning to Defendants' objection to the issuance of a preliminary injunction, the Court notes that "[a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store," Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004), and that "prevarications about repayment" and "strong indication[s] that the defendant may dissipate or conceal assets" are sufficient to demonstrate the irreparable-harm prong of the necessary analysis, Micro Signal Research, Inc. v. Otus, 417 F.3d 28, 31 (1st Cir. 2005) (citation omitted).  Magistrate Judge Sullivan's reasoning

and ultimate conclusion that this case's facts tip the balance in favor of finding irreparable harm bears repeating:

> [T]he undisputed evidence establishes Caramadre's pervasive fraudulent behavior in concocting and implementing the scheme, as well as his ongoing failure to satisfy his restitution obligation to Plaintiffs or to his other victims beyond a de minimis payment, none of which has been distributed to Plaintiffs. The sheer size of what he owes in restitution alone is enough to push Plaintiffs' belief that their judgment will be uncollectable over the line demarcating the "unsubstantiated fear" found in Charlesbank Equity Fund II and the concrete and demonstrable risk as found in Micro Signal Research and Teradyne. Also, while far from determinative, the Court cannot ignore Caramadre's 2011 representations of 'limited financial resources,' as well as the potentially destabilizing impact of the ongoing divorce proceeding.

The R&R (ECF No. 245) is, therefore, ACCEPTED in its entirety.

Plaintiffs' Motion for Prejudgment Attachment and Preliminary Injunction (ECF No. 187) is GRANTED. A Writ of Attachment for Caramadre's interest in ADM assets shall issue forthwith.

IT IS SO ORDERED.

_William E. Smith_
Chief Judge
Date: August 31, 2017

4

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

TRANSAMERICA LIFE INSURANCE          :
COMPANY and WESTERN RESERVE LIFE     :
ASSURANCE CO. OF OHIO,               :
    Plaintiffs,                      :
                                     :
    v.                               :    C.A. No. 09-470S
                                     :
JOSEPH CARAMADRE, RAYMOUR            :
RADHAKRISHNAN, ESTATE PLANNING       :
RESOURCES, INC., ADM ASSOCIATES LLC, :
HARRISON CONDIT, EDWARD              :
MAGGIACOMO, JR., and FORTUNE         :
FINANCIAL SERVICES, INC.,            :
    Defendants.                      :

## REPORT AND RECOMMENDATION

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Before the Court is the Motion of Plaintiffs Western Reserve Life Assurance Co. of Ohio

("Western Reserve") and Transamerica Life Insurance Company ("Transamerica") (collectively,

"Plaintiffs") for prejudgment attachment of Defendant Joseph Caramadre's membership interest

in Defendant ADM Associates, LLC ("ADM"), and for a preliminary injunction preventing

Caramadre from transferring his interest in or the assets of ADM.  ECF No. 187.  This Motion

was originally filed on November 17, 2015.  The Court addressed this issue in the same

proceeding that resulted in the granting of Plaintiffs' motion for partial summary judgment, but

determined that this issue should be held for additional briefing.  ECF No. 231; Transamerica

Life Ins. Co. v. Caramadre, C.A. No. 09-470 S, 2017 WL 752145, at *7-9 (D.R.I. Feb. 27, 2017)

("Transamerica").

After the Motion was referred to me for further proceedings, I ordered all parties to

advise the Court which of them wished to be heard on the Motion, present further evidence, or

file supplemental briefs.  Only Plaintiffs and Defendants Caramadre and ADM responded; these parties advised the Court that resolution of the Motion depends on the application of law to undisputed facts and that no testimony or additional evidence would be offered.  ECF No. 238. A supplemental briefing schedule was set and a hearing was held on June 23, 2017.  At the hearing, Defendants requested and were given an opportunity to supplement the record with additional information but then opted not to do so.  The Motion is now ripe for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons that follow, I recommend that it be granted.

## I.      BACKGROUND

This civil action arises out of a complex fraudulent scheme concocted by Mr. Caramadre, which has been exhaustively described by this Court, the First Circuit Court of Appeals and the Rhode Island Supreme Court.  See Transamerica, at *1.[1]  This report and recommendation assumes the reader's familiarity with both the scheme and the civil and criminal litigation it spawned.

In 2008, Plaintiff Western Reserve issued an annuity with a double-enhanced death benefit to Caramadre's alter ego entity, ADM.  See Transamerica, at *4 (holding that "ADM is an alter ego of Caramadre as a matter of law").[2]  The annuity provided that this death benefit would become available upon the death of the terminally-ill annuitant, Charles Buckman.  ADM paid Western Reserve a premium of $1 million for the Buckman annuity.  As a result of Charles Buckman's death on July 14, 2013, ADM now owns the contractual right to claim the death

---

[1] See also United States v. Caramadre, 807 F.3d 359 (1st Cir. 2015); Western Reserve Life Assur. Co. of Ohio v. Caramadre, 847 F. Supp. 2d 329 (D.R.I. 2012); Western Reserve Life Assur. Co. of Ohio v. ADM Assocs., LLC, 116 A.3d 794 (R.I. 2015).

[2] ADM is a Rhode Island limited liability company formed by Caramadre in 2006.  Caramadre is its sole member. Transamerica, at *4.  It is undisputed that the annuity currently in dispute ("the Buckman annuity") is ADM's only asset and that it was purchased by ADM from Western Reserve in furtherance of Caramadre's scheme.  Id.

benefit on the annuity from Western Reserve, worth over $1 million.[3]  However, the annuity

remains in limbo because ADM has not yet filed a claim.

When the scheme was first revealed, soon after the Buckman annuity issued, Western

Reserve tried to rescind the annuity and tender the $1 million premium back to ADM.  After the

tender was refused, Western Reserve and its affiliate, Transamerica, initiated this lawsuit.

Plaintiffs sought rescission of the Buckman annuity, as well as damages and other relief from

Caramadre and others arising from the scheme.  Western Reserve's effort to rescind the annuity

ultimately failed (after six years of litigation), based on a ruling on two certified questions by the

Rhode Island Supreme Court.  Western Reserve Life Assurance Co. v. ADM Assocs., Inc., 116

A.3d 794, 804, 806 (R.I. 2015).  After that decision, Plaintiffs amended their complaint,

consolidating their remaining claims into a single pleading; the Consolidated Complaint

("Complaint") was filed on November 17, 2015.  ECF No. 186.  Against Caramadre, its claims

are: Count III (state law conspiracy); Count IV (Racketeer and Corrupt Organizations Act

("RICO")); Count V (civil liability for crimes); and Count XII (unjust enrichment).  The unjust

enrichment claim is based in part on the allegations that the Buckman annuity is a financial

benefit received by Caramadre as a result of the fraudulent scheme through his alter ego, ADM,

and that it would be inequitable for him to retain it.  ECF No. 186 ¶¶ 298-303.  Count XIII is

asserted against ADM, alleging reverse piercing/alter ego based on the claim that ADM was

formed by Caramadre as part of the scheme to obtain the Buckman annuity.  ECF No. 186 ¶¶

315-22.

Paralleling the civil case, the criminal prosecution of Caramadre was initiated by an

indictment returned by the grand jury on November 17, 2011.  The criminal case culminated in

---

[3] The precise value of the death benefit is not determinable until the moment it becomes payable.  The record reveals
only that its undisputed value is more than $1 million.

November 2012 in Caramadre's guilty plea,[4] pursuant to which he admitted to mail fraud, wire fraud and identity fraud, including the fraudulent receipt of "millions of dollars by making . . . material misrepresentations and omissions to [ ] terminally-ill people . . ." Transamerica, at * 2. As part of that plea, Caramadre now owes restitution in the amount of $909,907.21 to Plaintiff Transamerica and $1,102,464.28 to Plaintiff Western Reserve. United States v. Caramadre, CR No. 11-186 S, 2014 WL 409336, at *5 (D.R.I. Feb. 3, 2014) ("Caramadre"). In total, Caramadre owes over $46 million in restitution to the victims of the scheme; the sentence requires that this be paid in a lump sum "immediately." Caramadre, at *4; ECF No. 247. According to the public record, he has paid a total of $4,815.69 towards this obligation. As of this writing, the public record also reflects that the United States has begun to take action to collect the restitution in that it has initiated three garnishment proceedings[5] to recover assets of Caramadre in the hands of third parties, although no such action has been filed against ADM. It is undisputed that Plaintiffs have yet to receive any restitution.

Based on their belief that the right to the Buckman death benefit may be the only asset available to Caramadre to satisfy a judgment in this case and that the dissipation or loss of ADM's assets will cause them irreparable harm, Plaintiffs filed this Motion in 2015, seeking to attach Caramadre's interest in ADM and to enjoin him from transferring this interest, or any other of ADM's assets, to any other person or entity. To support their need for security and to establish the likelihood of irreparable harm, Plaintiffs point to various Caramadre filings in 2011,

---

[4] The guilty plea was followed by a year of collateral litigation as Caramadre attempted, unsuccessfully, to withdraw it. Finally, in December 2013, Caramadre was sentenced to six years of incarceration; as of this writing, he is still serving that sentence. It must be noted that Caramadre recently filed a motion to vacate the criminal conviction pursuant to 28 U.S.C. § 2255. That motion is pending.

[5] See United States v. Caramadre, C.A. No. 16-466S (D.R.I.); United States v. Caramadre, C.A. No. 16-445S (D.R.I.); United States v. Caramadre, C.A. No. 16-428S (D.R.I.).

in which he claimed to have "limited resources."[6]  ECF No. 125 at 10; ECF No. 187-8 at 2.

More significantly, they emphasize Caramadre's $46 million-plus restitution obligation, towards

which he has paid virtually nothing, exacerbated by his sentence of incarceration during which

time he will be unable to earn more than a *de minimis* amount.  Moreover, Caramadre is now

involved in divorce proceedings.[7]  Based on these obligations, Plaintiffs have consistently argued

that Caramadre will be unable to satisfy a judgment in this case, which they estimate could

exceed $10 million.  Transamerica, at *7.  In response, Caramadre has stood silent, providing no

assurance that he expects to be able to pay Plaintiffs' judgment.

        The landscape pertinent to Plaintiffs' Motion shifted when the Court issued its

memorandum and order in Transamerica.  In particular, by granting partial summary judgment in

favor of Transamerica and Western Reserve on two of their four claims against Caramadre and

on their claim against ADM, Transamerica definitively resolved the issue of Plaintiffs'

likelihood of success on the merits on some of their claims against these two Defendants.

        Specifically, Transamerica resolved Count V, with the holding that Caramadre[8] is civilly

liable to Plaintiffs for money damages, pursuant to R.I. Gen. Laws § 9-1-2, based on the criminal

conduct admitted in his plea agreement, which includes, *inter alia*, mail fraud, wire fraud,

identity theft, forgery and conspiracy to defraud Plaintiffs and other insurance companies.

Transamerica, at *2-3.  Second, the Court ruled on Count IV that the undisputed evidence

establishes that Caramadre engaged in "racketeering" and is consequently liable to Plaintiffs for

---

[6] Caramadre correctly points out that six years have passed since his attorneys wrote those words and that, since 2011, he has consistently been able to retain counsel to defend himself in the criminal case.

[7] The Court afforded Caramadre the opportunity to supplement the record with information pertaining to the divorce proceeding to undermine Plaintiffs' contention that the pendency of such a proceeding enhances the risk that Caramadre may become insolvent and unable to satisfy their judgment.  Nothing was provided.

[8] Transamerica also granted partial summary judgment against Defendant Raymour Radhakrishnan on Counts IV and V.

treble damages, attorney's fees and costs.  Third, the Court sustained Plaintiffs' claim in Count

XIII that they may reach the assets of ADM through Caramadre through a reverse piercing of the

corporate veil based on application of the "equitable alter ego doctrine."  Id. at *4.  The Court

also granted summary judgment in favor of Plaintiffs on all of Caramadre's and ADM's

counterclaims for breach of contract, promissory estoppel, breach of the duty of good faith and

fair dealing, declaratory judgment, and negligent infliction of emotional distress.  Id. at *4-7.

The Court specifically rejected the claim that Western Reserve's unsuccessful attempt to rescind

the Buckman annuity was a breach of contract or otherwise actionable.  Id. at *5.

The Court considered, but did not resolve, Plaintiffs' arguments that a prejudgment

attachment is appropriate because they will likely obtain a judgment against Caramadre for

millions of dollars; that Caramadre will not have the financial means to satisfy the judgment; and

that the only asset that may be available to Caramadre is the Buckman annuity owned by his alter

ego, ADM.  Transamerica, at *7.  The Court alluded to, but did not resolve, Caramadre's

counter-argument that Rhode Island law permits prejudgment attachment in tort actions only

against nonresidents with property in the state, R.I. Gen. Laws § 10-5-6, and all of Plaintiffs'

claims sound in tort while he is still a resident of Rhode Island, despite being incarcerated in a

federal prison in Massachusetts.  Id. at *8.  The Court also considered, but did not resolve,

Plaintiffs' argument that the federal court is empowered to issue an asset-freezing injunction

pending resolution of an equitable claim for unjust enrichment, even though it may lack authority

to issue an injunction to preserve assets pending adjudication of legal claims.  Id. at *8, (citing

Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 333 (1999)).

Ultimately, based on its recognition that the status of Caramadre's financial assets may have

changed since the attachment Motion was filed, the Court directed Plaintiffs to restate whether

they intended to proceed with their Motion.  Id. at *9.  When they indicated that they did, the

Motion was referred to me.  ECF No. 236, Text Order of May 11, 2017.

## II.   PREJUDGMENT ATTACHMENT

### A.   <u>Applicable Law</u>

Prejudgment attachment in federal cases is governed by Fed. R. Civ. P. 64, which

provides that "every remedy is available that, under the law of the state where the court is

located, provides for seizing a person or property to secure satisfaction of the potential

judgment."  In Rhode Island, prejudgment attachment is addressed by statute, R.I. Gen. Laws §

10-5-1, *et seq.*, and by rule, R.I. Super. R. Civ. P. 4(m).  The Rule provides that a motion for

prejudgment attachment "shall be granted only upon a showing that there is a probability of a

judgment being rendered in favor of the plaintiff and that there is a need for furnishing the

plaintiff security in the amount sought for satisfaction of such judgment, together with interest

and costs."  R.I. Super. R. Civ. P. 4(m)(3).  The overarching statutory provision is R.I. Gen.

Laws § 10-5-2, which provides that, "[a] court having jurisdiction over a defendant or his or her

assets, including his or her personal estate or real estate, may authorize a plaintiff to attach the

defendant's assets, or any part thereof, after hearing on a motion to attach, notice of which has

been given to the defendant as provided in this section."  If a plaintiff sustains his or its burden

with the proper showing, the court "may command the attachment of the goods and chattels of

the defendant . . . in the hands or possession of any person, copartnership or corporation."  R.I.

Gen. Laws § 10-5-7.  The Superior Court has held that "[a]ttachment for security reasons is

appropriate when it appears likely that the plaintiff will have difficulty enforcing the judgment."

<u>Atlantic P.B.S. Inc. v. Long</u>, C.A. No. 89-1705, 1994 WL 931005, *3 (R.I. Super. Dec. 5, 1994)

(addressing post-judgment attachment).

In support of their Motion, Plaintiffs invoke R.I. Gen. Laws § 10-5-6, which applies to actions "at law," and provides that prejudgment attachment may issue in a civil action sounding in tort only against a nonresident having property within the state. See United States v. J. Tirocchi & Sons, Inc., 180 F. Supp. 645, 647 (D.R.I. 1960). In addition, based on their claim of unjust enrichment, Plaintiffs also contend that attachment should issue pursuant to R.I. Gen. Laws § 10-5-5, which permits prejudgment attachments in "any civil action of an equitable character." The parties do not dispute that ADM's assets are subject to prejudgment attachment to secure Plaintiffs' claims against Caramadre based on his status as the sole member of ADM and ADM's status as a Rhode Island limited liability company and Caramadre's alter ego. Nor is there any dispute that Caramadre and ADM have been afforded both notice and an opportunity to be heard on Plaintiffs' prejudgment attachment motion, as required by § 10-5-2.

## B. Analysis

### 1. Attachment under R.I. Gen. Laws § 10-5-6

Attachment under R.I. Gen. Laws § 10-5-6 is permissible in tort actions against nonresidents. Martin v. Lincoln Bar, Inc., 622 A.2d 464, 468 (R.I. 1993). Plaintiffs' Motion for a prejudgment attachment under R.I. Gen. Laws § 10-5-6 rests on the foundation of Count V, civil liability for criminal fraud, and Count IV, the RICO claim, as to both of which the Court has already held that judgment should issue in favor of Plaintiffs. Transamerica, at *2-4. Both claims are grounded in fraud, which the Rhode Island Supreme Court has classified as "sounding in tort," for purposes of determining which attachment statute applies. See, e.g., J. Tirocchi & Sons, 180 F. Supp. at 651 (fraudulent scheme gives rise to claims sounding in tort); Cortelesso v. Zanni, 694 A.2d 751, 752 (R.I. 1997) (fraud and bribery claims sound in tort). Caramadre argues that prejudgment attachment under R.I. Gen. Laws § 10-5-6 is improper because he is a Rhode

Island resident, notwithstanding his continuing incarceration in Massachusetts.  <u>Martin</u>, 622 A.2d at 469.  While Caramadre may well be domiciled in Rhode Island, I find that he currently resides in Massachusetts.

The core principles are relatively straightforward.  Residency is not synonymous with domicile – it is well settled that one can be domiciled in one place but reside in another.  <u>Miss. Band of Choctaw Indians v. Holyfield</u>, 490 U.S. 30, 48 (1989).  Further, unlike domicile, "[r]esidence . . . is not a word of fixed legal definition but must be interpreted according to the context and the purpose of the statute in which it is found."  <u>Flather v. Norberg</u>, 377 A.2d 225, 228 (R.I. 1977).

The Rhode Island Supreme Court appears to have addressed the meaning of residency in the attachment context only once, in 1925, when it held that a defendant who "maintained a home on his farm in this state where he resided with his family, although he was temporarily out of the state at the [time of the commencement of the action]," was not a "nonresident" so that his property was released from attachment.  <u>Silva v. Superior Court</u>, 128 A. 212 (R.I. 1925).  In other states, courts have similarly construed analogous statutes by focusing on where the defendant actually lives: "[t]he pivotal word . . . is 'non-resident' . . . the words 'domicile' and 'residence' are not synonymous."  <u>Stephens v. AAA Lumber Co.</u>, 384 S.W.2d 943, 945 (Ark. 1964).  To illustrate, in <u>Stephens</u>, the court described a mother who left the state of her domicile and accompanied her children into another state, with the intention of returning when their education was completed; despite her intent to return, attachment in the state of her domicile was permissible because she was deemed to be a nonresident.  <u>Id.</u>; <u>see</u> <u>Brown v. Brown</u>, 261 S.W. 959, 960 (Tenn. 1924) ("courts . . . with . . . unanimity, have construed the word 'nonresident,' in attachment statutes, to refer to the abode or place where the defendant actually lives, and hold

that he may be domiciled within the state and still be a nonresident"). Thus, the focus in an attachment statute is on the defendant's "actual place of abode, whether temporary or permanent." Loew's, Inc. v. Dorsey, 97 N.Y.S.2d 315, 316-17 (N.Y. Sup. Ct. 1950) (attachment was vacated when band leader, who traveled with orchestra and was residing at Hotel Statler in New York City when attachment issued, was found to be resident of New York).

Here, Caramadre may be domiciled in Rhode Island, but he is unquestionably residing in Massachusetts. Accordingly, I find that he is a nonresident, so that prejudgment attachment based on Plaintiffs' tort claims is permitted by R.I. Gen. Laws § 10-5-6.

### 2. *Attachment under R.I. Gen. Laws § 10-5-5*

Section 10-5-5 permits attachment based on claims that are "equitable in character." R.I. Gen. Laws § 10-5-5. It has been held to be a "remedial statute and as such should be given a liberal interpretation." Marsh v. Moore, 161 A. 227, 228 (R.I. 1932) (interpreting predecessor to § 10-5-5). Plaintiffs rely on their unjust enrichment claim in Count XII as the basis for invoking R.I. Gen. Laws § 10-5-5. Under Rhode Island law, a claim of unjust enrichment "is not simply a remedy in contract and tort but can stand alone as a cause of action in its own right." Dellagrotta v. Dellagrotta, 873 A.2d 101, 113 (R.I. 2005). Such a claim clearly sounds in equity. United Lending Corp. v. City of Providence, 827 A.2d 626, 632 (R.I. 2003); R.I. Hosp. Trust Co. v. R.I. Covering Co., 190 A.2d 219, 220-21 (R.I. 1963). Accordingly, I find that Count XII states a "civil action of an equitable character," so that attachment of the asset related to it (Caramadre's interest in ADM, whose sole asset is the Buckman annuity) is proper pursuant to R.I. Gen. Laws § 10-5-5.

### 3. *Probability of Judgment in Favor of Plaintiffs*

To proceed with attachment under either statutory section, Plaintiffs must demonstrate that there is a probability of judgment being rendered in their favor on the pertinent claims. R.I.

Super. R. Civ. P. 4(m).  For purposes of R.I. Gen. Laws § 10-5-6, Plaintiffs easily sustain their

burden based <u>Transamerica</u>'s grant of summary judgment in Plaintiffs' favor on Counts V, IV

and XIII, as well as on all of Caramadre's and ADM's counterclaims.

To successfully invoke R.I. Gen. Laws § 10-5-5, Plaintiff must show that their unjust

enrichment claim is likely to succeed.[9]  To prevail on an unjust enrichment claim under Rhode

Island law, a claimant must prove: (1) that he or she conferred a benefit upon the party from

whom relief is sought; (2) that the recipient appreciated the benefit; and (3) that the recipient

accepted the benefit under such circumstances "that it would be inequitable for [the recipient] to

retain the benefit without paying the value thereof."  <u>Dellagrotta</u>, 873 A.2d at 113 (quoting

<u>Bouchard v. Price</u>, 694 A.2d 670, 673 (R.I. 1997)).  Here, Plaintiffs' unjust enrichment claim is

grounded in the allegations that the Buckman annuity is a financial benefit received by

Caramadre as a result of the fraudulent scheme through his alter ego, ADM, and that it would be

inequitable for him to retain it.  ECF No. 186 ¶¶ 298-303.  It relies on the undisputed facts that

the Buckman annuity was purchased by ADM from Western Reserve as part of the fraudulent

scheme, and that Western Reserve is one of the victims of that scheme.  <u>United States v.</u>

<u>Caramadre</u>, No. CR 11-186S, 2013 WL 7138106, at *11-17 (D.R.I. Nov. 13, 2013).  With

summary judgment already granted in Plaintiffs' favor on Counts IV and V, there is more than

enough evidence to support a finding that it would be inequitable for Caramadre or ADM to

retain the Buckman annuity.  Caramadre and ADM have not managed to marshal a serious

argument[10] that Plaintiffs are unlikely to prevail on this equitable claim.  Based on the foregoing,

---

[9] Plaintiffs did not move for summary judgment on unjust enrichment; therefore, it was not addressed in <u>Transamerica</u>.

[10] Caramadre and ADM originally argued that their counterclaims should be considered in determining the likelihood that Plaintiffs will prevail on their unjust enrichment claim.  That rationale disappeared with the Court's grant of summary judgment in favor of Plaintiffs on all of the counterclaims.  <u>Transamerica</u>, at *4-7.

I find that Plaintiffs have sustained their burden of establishing that there is a probability of a judgment in their favor on the unjust enrichment claim so as to justify attachment of the asset to which that claim relates.

### 4.    Need for Furnishing Security

In addition to the probability of judgment, the Rule also requires a demonstration that "there is a need for furnishing the plaintiff security in the amount sought for satisfaction of such judgment, together with interest and costs."  R.I. Super. R. Civ. P. 4(m)(3).  Caramadre asserts that Plaintiffs have failed to show the need for security.  Plaintiffs argue that they anticipate a substantial recovery in this case and that, while they have limited information available about Caramadre's resources, it is clear that his obligations are very substantial.  In addition, Caramadre has provided them with no assurances of his ability to pay a judgment.

To establish the "amount sought" based on their probable recovery on the tort claims, Plaintiffs rely on the criminal restitution order, which valued their injuries at $2,012,371.49, pursuant to 18 U.S.C. § 3663A.  Alternatively, according to the damages chart appended to the unrebutted Vorhies Declaration, which was presented by Plaintiffs to support the Motion, their losses exceed $2.7 million.  ECF No. 187-4 at 50.  Plaintiffs point out that the Court has already granted summary judgment in their favor on their RICO claim, which affords them the right to recover treble damages and attorney's fees.  18 U.S.C. § 1964(c).  With prejudgment interest, Plaintiffs have sustained their burden of establishing the amount of their estimated probable recovery in connection with the attachment requested pursuant to R.I. Gen. Laws § 10-5-6 as approaching or exceeding $10 million.[11]  As to attachment pursuant to R.I. Gen. Laws § 10-5-5,

---

[11] Caramadre originally challenged this figure by arguing in passing that Plaintiffs recouped some of their losses in their confidential settlements; in a footnote in his brief, he asked that the amounts of these settlements be disclosed so that he can rebut the amount of Plaintiffs' damages claim.  ECF No. 203-1 at 6 n.2.  In the second round of briefing on the Motion that followed the Court's grant of summary judgment, Caramadre and ADM did not refresh

the "amount sought" based on Plaintiffs' probable recovery on the claim of unjust enrichment, of course, is derived from the value of the Buckman annuity itself, which is the very asset that they are seeking (through ADM) to attach.

The other half of Plaintiffs' factual proffer on their need for security focuses on what little they know of Caramadre's resources, coupled with the incontrovertible information available regarding his $46 million restitution obligation, which the United States has begun to take steps to collect, as well as the further uncertainty created by the pendency of the recently-initiated divorce proceedings. Plaintiffs couple these obligations and potential obligations with Caramadre's inability to earn while incarcerated and his 2011 representation that he needed a stay of this case while the criminal case was pending in light of his "limited resources." ECF No. 125 at 10; see also ECF No. 187-8 at 2 (December 16, 2011, memorandum advising that, despite "limited financial resources," Caramadre is withdrawing his request for court-appointed counsel). Further, when the analysis of the need for security focuses on the Buckman annuity, whether viewed through the lens of the tort claims or the unjust enrichment claim, the risk that it will be dissipated by Caramadre's need to pay other creditors or attorney's fees or as directed by a divorce decree is imminent and concrete, indeed, heightened by the very public nature of the dispute over the fate of this significant asset. Also important, when faced with Plaintiffs' arguments regarding their need for security, neither Caramadre nor ADM has provided any assurances that they will be able to satisfy a judgment, either resulting from the tort claims or in connection with the unjust enrichment claim. See Teradyne, Inc. v. Mostek Corp., 797 F.2d 43, 53 (1st Cir. 1986) (with assets subject to unspecified offsets and debits, lack of assurance of ability to pay judgment sufficient to show that injunction needed to protect damage remedy).

---

this argument – instead, they agreed that the facts are undisputed so that no additional evidence would be required. ECF No. 238. Therefore, I deem the argument waived.

13

Considering all of these factors, I find that Plaintiffs have sustained their burden of showing their need for security in that Caramadre's interest in ADM and its sole asset, the Buckman annuity, is unlikely to be available to satisfy either (1) the substantial judgment that is probable on the tort claims, or (2) the judgment that is probable on the claim for unjust enrichment, the amount of which derives from the value of the Buckman annuity. Atlantic P.B.S., 1994 WL 931005, at *3 (need for security established by evidence that defendant terminated business entity and that other creditors had procured attachments). Therefore, attachment of his membership interest in ADM should be ordered pursuant to both R.I. Gen. Laws §§ 10-5-6 and 10-5-5.

## III.     PRELIMINARY INJUNCTION

### A.     Applicable Law

Plaintiffs seek an order from this Court to enjoin Caramadre from transferring his interest in, as well as any assets of, ADM until this lawsuit is resolved. The Court has the power to issue a preliminary injunction to prevent Caramadre from disposing of assets in which an equitable interest is claimed while litigation is pending. Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004) (articulating standard for obtaining pre-judgment "freeze order"); Tornfeldt v. Pino, 181 A.2d 99, 100 (R.I. 1962) (affirming preliminary injunction preventing defendant from "alienating any of the monies represented by said bank accounts . . . until further order of the court"). Consistent with the Supreme Court's holding in Grupo Mexicano, this power is grounded in Plaintiffs' unjust enrichment claim, Count XII, which is focused on Plaintiffs' equitable interest in the specific asset (the Buckman annuity) that the injunction would prevent Caramadre or ADM from transferring. See Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc., 77 F. Supp. 2d 199, 203-04 (D. Mass. 1999) (Grupo Mexicano

permits injunction when plaintiff creditor asserts equitable claim to specific assets or seeks equitable remedy involving those assets).  When the Fourth Circuit interpreted Grupo Mexicano, it specifically held that a claim for unjust enrichment is a legally permissible foundation to permit the freezing of the asset affected by the claim; this power arises from the long-settled principle that the court may invoke equity to preserve status quo pending judgment.  United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 496 (4th Cir. 1999) (Grupo Mexicano restricts "injunction in actions solely at law").

In determining whether to grant a preliminary injunction to protect assets that may eventually be used to satisfy a judgment, federal courts consider:

(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Charlesbank Equity Fund II, 370 F.3d at 162.  Such a "preliminary injunction, designed to freeze the status quo and protect the damages remedy, is an appropriate form of relief when it is shown that the defendant is likely to be insolvent at the time of judgment."  Teradyne, 797 F.2d at 52 (citing Deckert v. Indep. Shares Corp., 311 U.S. 282 (1940)).

**B**.    **Analysis**

The Court's task is to examine each of the four factors to determine whether the circumstances of this case warrant issuance of a preliminary injunction to prevent Caramadre from taking any actions that would result in the transfer or squandering of ADM's funds, which would otherwise be available to satisfy a judgment against Caramadre.  The first factor – likelihood of success on the merits – does not require an extended discussion.  With no material difference between the probability of judgment entering in Plaintiffs' favor, as discussed above in the context of attachment, and the equitable requirement that Plaintiffs must show that they are likely to succeed on

15

the merits of the claim on which the injunction is based, I refer the reader back to that analysis. Accordingly, I find that the first factor is readily satisfied for the unjust enrichment claim.

The second factor – the potential for irreparable harm – requires a more robust look.  As the First Circuit held in Teradyne, a defendant's likely inability to satisfy a judgment constitutes "irreparable harm" for purposes of determining whether to grant a preliminary judgment to freeze an asset.  797 F.2d at 52.  Nevertheless, the proponent of such an injunction must show more than just an unsubstantiated fear or surmise that there will be nothing when the case ends.  Charlesbank Equity Fund II, 370 F.2d at 162-63 ("speculative forecast" of uncollectability not enough to justify issuance of prejudgment injunction).  However, if there is a strong indication that the defendant may dissipate or conceal assets, an injunction should enter.  Micro Signal Research, Inc. v. Otus, 417 F.3d 28, 31 (1st Cir. 2005).  Evidence of fraudulent conduct, coupled with prevarication about repayment, amounts to ample support justifying such relief.  Id. at 31-32 (injunction entered against defendant shown to be involved in fraud, but not against defendant whose involvement in fraud less clear); Teradyne, 797 F.2d at 52 (defendant alleged to be guilty of fraud, was threatened with many lawsuits, and his business was at standstill; irreparable harm found and injunction affirmed).

In this case, the undisputed evidence establishes Caramadre's pervasive fraudulent behavior in concocting and implementing the scheme, as well as his ongoing failure to satisfy his restitution obligation to Plaintiffs or to his other victims beyond a *de minimis* payment, none of which has been distributed to Plaintiffs.  The sheer size of what he owes in restitution alone is enough to push Plaintiffs' belief that their judgment will be uncollectable over the line demarcating the "unsubstantiated fear" found in Charlesbank Equity Fund II and the concrete and demonstrable risk as found in Micro Signal Research and Teradyne.  Also, while far from determinative, the Court cannot ignore Caramadre's 2011 representations of "limited financial resources," as well as the potentially destabilizing impact of the ongoing divorce proceeding.  Further, as in Teradyne, Caramadre's money-making business activities have been at a standstill during his years of

16

incarceration.  Capping Plaintiffs' factual proffer is Caramadre's failure to provide Plaintiffs with any assurances, a factor found to be material in Teradyne.  797 F.2d at 53.  Based on the foregoing, as well as for the reasons supporting my finding above that Plaintiffs have established a need for security, I find that the second factor – irreparable harm – tips in favor of the issuance of a preliminary injunction.

The third factor examines the balance of hardships associated with the decision to issue an injunction.  Caramadre urges the Court to compare Plaintiffs' total assets, by reference to the publicly reported revenues of their common parent, which is one of the largest issuers of annuities in the nation, with his own assumed meager financial capacity,[12] while Plaintiffs emphasize their status as victims of Caramadre's criminal scheme.  Both approaches ignore the most salient aspect of the relevant analysis.  This injunction will simply preserve the status quo by freezing an asset that has, *de facto*, been frozen throughout the four years that have passed since Charles Buckman's death.  The requested injunction will not inflict any concrete harm on Caramadre beyond the inchoate impact of having this asset that he has taken no steps to recover continue to be unavailable to him.  Therefore, I find that Plaintiffs' hardship arising from pursuing their claim for unjust enrichment only to find that it is worthless more than outweighs Caramadre's nebulous hardship in continuing to be unable to reach an asset that he has refrained from cashing in for four years.  See Teradyne, 797 F.2d at 53 (plaintiff's serious risk of winning worthless judgment outweighs inchoate hardship to defendant).

The fourth preliminary injunction factor looks at the public interest; it presses a thumb on the scale only in matters where the issuance of a preliminary injunction impacts the public interest.  In

---

[12] Caramadre acknowledges the inconsistency of this argument with his opposition to Plaintiffs' contention that they are at substantial risk of never collecting on their judgment because of his current precarious financial circumstances.  Without providing any concrete information about himself, he contends that the balance of harm tips his way because Plaintiffs are part of a large entity, while he is an individual.  Initially he also relied on his counterclaim alleging that he too is a victim because Western Reserve breached its contractual duty arising from the Buckman annuity; this argument disappeared with the Court's grant of summary judgment in favor of Plaintiffs on that counterclaim.

this case, the injunction sought would have no bearing on the public at large so this factor need not

be considered.  See Teradyne, 797 F.2d at 57 (affirming prejudgment freeze order without

consideration of public interest); Dunkin' Donuts Franchised Rests. LLC v. Wometco Donas Inc., 53

F. Supp. 3d 221, 232 (D. Mass. 2014) (when requested injunction would have "no measurable effect

on the public interest, court relies more heavily on the other criteria").

Based on the foregoing review of the relevant factors, I recommend that the Court issue the

preliminary injunction requested by Plaintiffs, freezing the status quo with respect to the asset that is

the subject of Plaintiffs' equitable claim by barring Caramadre from taking any action that would

result in the transfer or dissipation of ADM's sole asset, its interest in the Buckman annuity.

## IV.    CONCLUSION

I recommend that Plaintiffs' Motion for Prejudgment Attachment and for Preliminary

Injunction (ECF No. 187) be granted and that the Court enter an order attaching Caramadre's

membership interest in ADM and enjoining Caramadre from transferring any of ADM's assets or his

interest in ADM or in those assets.

Any objection to this report and recommendation must be specific and must be served

and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting

party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a

timely manner constitutes waiver of the right to review by the district judge and the right to

appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008);

Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
July 27, 2017